In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-2943

DANIEL O'SULLIVAN,

*Petitioner-Appellant,*

*v.*

UNITED STATES CITIZENSHIP and
IMMIGRATION SERVICES,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 8092—**Robert Gettleman**, *Judge.*

ARGUED JUNE 6, 2006—DECIDED JULY 6, 2006

Before FLAUM, *Chief Judge*, and POSNER and KANNE, *Circuit Judges*.

FLAUM, *Chief Judge.* Daniel O'Sullivan is not a United States citizen, yet he served honorably in the United States military during the Vietnam War. Years later, he was convicted of distributing cocaine, which he concedes is an "aggravated felony" under the relevant immigration statutes. The United States denied O'Sullivan's petition for naturalization, stating that he must prove good moral character in order to become a naturalized citizen and that his aggravated felony conviction prevents him from doing so. O'Sullivan argues that wartime veterans need not prove good moral character in order to be naturalized, or, if they

do, are not permanently barred from doing so by law even if they have been convicted of aggravated felonies. The district court affirmed the government's denial of O'Sullivan's petition for naturalization. O'Sullivan appeals. For the following reasons, we affirm.

## I.  Background

Daniel O'Sullivan was born in Jamaica, but moved to the United States as a lawful permanent resident when he was twelve years old. His parents and six siblings were also lawful permanent residents of this country. He graduated from high school in Milwaukee, Wisconsin, and enlisted in the Marine Reserves. Since he enlisted in March 1978, he qualifies as a veteran who served during a period of military hostilities under 8 C.F.R. § 329.2(a)(4), which defines the Vietnam Conflict as extending to October 15, 1978. O'Sullivan was discharged honorably and later served our nation again as a member of the United States Air Force. He was also honorably discharged from that service. After completing his military service, O'Sullivan returned to civilian life in this country. He had children, was consistently employed, and paid taxes.

In August 2000, O'Sullivan was convicted in the State of Wisconsin for being a party to the crime of manufacture or delivery of less than five grams of cocaine. He was sentenced to serve time in Wisconsin state prison. After serving his sentence, he was immediately transferred to the custody of the Department of Homeland Security, which had initiated removal proceedings against him while he was incarcerated.

While in removal proceedings, O'Sullivan filed a petition for naturalization under 8 U.S.C. § 1440, also known as Immigration and Naturalization Act § 329 ("§ 1440"). That law, in conjunction with 8 U.S.C. § 1429, allows non-citizens who served in the United States military during designated

times of hostilities against foreign governments to naturalize, even while removal proceedings are pending against them. The government denied O'Sullivan's naturalization petition in June 2004. The government stated that it believed O'Sullivan was unable to show good moral character due to his aggravated felony conviction, and therefore he was ineligible to naturalize.

O'Sullivan filed a timely appeal of the administrative decision. In December 2004, United States Citizenship and Immigration Services ("CIS," "the government," or "the agency") denied his appeal, again based on its belief that the relevant statutes, regulations, and case law demanded that O'Sullivan prove good moral character before he could become a naturalized citizen, and that his aggravated felony conviction prevented him from doing so.

O'Sullivan filed a petition for review of CIS's decision in district court, pursuant to 8 U.S.C. § 1421(c). After a full briefing, the district court affirmed CIS's denial of the petition for naturalization, essentially adopting the agency's reasoning. O'Sullivan timely appealed to this court.

While the debate over the naturalization petition has continued, O'Sullivan's deportation proceedings have carried on. The Board of Immigration Appeals affirmed the immigration judge's order of removal in September 2005. Thus, O'Sullivan currently has a final order of removal entered against him.

## II. Discussion

### 1. Chevron deference

As a threshold issue, we must decide what level of deference to accord the CIS's statutory interpretation in this case. O'Sullivan claims that we must review his claims of law de novo, because Congress has determined that federal courts should primarily resolve naturaliza-

tion questions. The statutory support for this position is found in 8 U.S.C. § 1421(c), which states that an alien may seek review in a district court if his application for naturalization is denied, and further states that "[s]uch review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application." This procedure is in stark contrast to the appeal process for orders of deportation and petitions for asylum, in which federal courts accord the Attorney General great deference. *See, e.g.*, 8 U.S.C. § 1252(b)(4). Moreover, O'Sullivan believes that Congress has delegated no authority to the agency to interpret the naturalization statute. In 8 U.S.C. § 1421(d), O'Sullivan argues, Congress makes clear that the Attorney General may naturalize *only* under the terms set by Congress itself. ("A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise.") Therefore, O'Sullivan believes that *Chevron* deference would be inappropriate in this case.

CIS responds that in *Nolan v. Holmes*, 334 F.3d 189 (2d Cir. 2003), and *Boatswain v. Gonzales,* 414 F.3d 413 (2d Cir. 2005), the Second Circuit determined that CIS's interpretation of naturalization regulations is entitled to the high deference outlined in *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837 (1984). Further, CIS believes that the policy reasons that usually support deferring to agencies apply with equal force in the naturalization context. Immigration is a complex and narrow field with numerous policy interests competing for prominence. CIS argues that a specialized agency is therefore better equipped to evaluate and weigh the competing policy interests than a generalized federal court. *Batanic v. INS*, 12 F.3d 662, 665-66 (7th Cir. 1993) (citing *Presley v. Etowah County Comm'n,* 502 U.S. 491, 508 (1992)).

Although we disagree with O'Sullivan's contention that Congress has delegated no rulemaking authority to CIS,[1] we are persuaded that we should review his naturalization claim de novo. Congress specifically calls for de novo review in naturalization cases, while ordering great deference in other immigration contexts. We do not find this to be coincidental. A person who is arguably entitled to be a United States citizen, with all of the privileges citizenship entails, is not rightly at the grace of the Attorney General, as other aliens are often considered to be. Therefore, before denying citizenship and the rights attendant to it, it would stand to reason that the district court should review the Attorney General's decision as if it were reviewing a citizen's claim that the government is unfairly denying him his rights. Section 1421(c) seems to reflect this logic by requiring district courts to make de novo findings of fact and law. We therefore will review O'Sullivan's claim de novo.[2]

---

[1] Regulations that merely fill gaps in the statute would not violate 8 U.S.C. § 1421(d), which simply requires that a citizen be naturalized "in the manner and under the conditions prescribed in this subchapter."

[2] Our decision today is not in conflict with *Nolan v. Holmes*, 334 F.3d 189 (2d Cir. 2003). That case arose in a markedly different procedural context. In that case, the court was not asked to review the denial of a naturalization petition, but was instead asked to review a deportation order. *Chevron* deference is entirely appropriate in that procedural context. We do, however, disagree with *Boatswain v. Gonzales*, 414 F.3d 413 (2d Cir. 2005),which extended *Chevron* deference to direct review of the denial of a naturalization petition. In *Boatswain*, the petitioner's concession that the statutory interpretation upheld as reasonable in *Nolan* was binding in this new procedural context was accepted by the court. We believe that concession was in error.

*2.  Does § 1440 entirely excuse qualifying aliens from the good moral character requirement?*

The primary question in this case is whether § 1440 excuses aliens who served honorably in the U.S. military in times of war from making a showing of good character when applying to become naturalized citizens. Most of the confusion stems from the good character requirement's placement in the naturalization statute. That statute provides, under the subsection entitled "residence":

> No person . . . shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the state or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously in the United States from the date of the application up to the time of admission to citizenship, and **(3) during all the periods referred to in this subsection has been and still is a person of good moral character**, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a) (emphasis added).

Section 1440(b) relaxes these requirements for aliens who have honorably served in the U.S. Military in times of war. That section provides:

> A person filing an application under . . . this section **shall comply in all other respects with the requirements of this subchapter**, except that—

(1) he may be naturalized regardless of age, and notwithstanding the provisions of section 1429 of this title as they relate to deportability . . .

(2) **no period of residence or specified period of physical presence within the United States** or any State or district of the Service in the United States **shall be required**; . . .

8 U.S.C. § 1440(b)(1)-(2) (emphasis added).

O'Sullivan argues that since wartime veterans are exempted from the residence requirements of naturalization, they are necessarily exempted from the good moral character requirement, which is located in the residency subsection and not elsewhere in the statute. He argues that the good moral character requirement in § 1427(a)(3) is "explicitly predicated" on "the period for which good moral character is required to be shown." He emphasizes the language "during all periods referred to in the subsection," which immediately precedes the requirement that an applicant was and still is a person of good moral character. 8 U.S.C. 1427(a)(3). Because this "period" is waived for veterans by § 1440, veterans need not show good moral character during that "period," O'Sullivan believes. He hypothesizes that Congress determined that good moral character is "inherent" in a veteran's honorable service to the United States in a time of war. Essentially, the argument is that good moral character is a subset of the residency requirement—a requirement that has been waived for wartime veterans.

O'Sullivan attempts to bolster his argument by pointing to the statute that governs alien peacetime veterans who wish to naturalize. That statute provides that an alien who served honorably in the United States military for a period or periods aggregating one year:

(a) . . . may be naturalized without having resided, continuously immediately preceding the date of filing

such person's application, in the United States for at least five years, and in the state or district of the Service in the United States in which the application for naturalization is filed for at least three months, and without having been physically present in the United States for any specific period, **if such application is filed while the applicant is still in service or within six months after the termination of such service.**

. . .

(c) Periods when not in service

In the case such applicant's service was not continuous, the applicant's residence in the United States . . . [and] good moral character . . . during any period within five years immediately preceding the date of filing such application between the periods of applicant's service in the Armed Forces, shall be alleged in the application . . . and proved at any hearing thereon. Such allegation and proof shall also be made as to any period between the termination of applicant's service and the filing of the application for naturalization.

. . .

(e) Moral character

. . . [G]ood moral character **during [honorable peace-time service in the military] shall be proved by** duly authenticated copies of the records of the executive departments having custody of the records of such service, and such authenticated copies of records shall be accepted in lieu of compliance with provisions of section 1427(a) of this title.

8 U.S.C. § 1439(a), (c), & (e) (emphasis added).

O'Sullivan urges us to find that the express mention of a moral character requirement for peacetime veterans shows

that Congress would have expressly required wartime veterans to prove good moral character, if that was Congress's will. Omission of the moral character requirement from § 1440, O'Sullivan maintains, must consequentially be read as intentional.

CIS replies that O'Sullivan's statutory interpretation is "hopelessly strained." CIS believes that it is clear that Congress intended for alien wartime veterans to be able to naturalize without first living in this country for five years and without being a lawful permanent resident before applying for naturalization. CIS points out that other than those requirements, an alien must "comply in all other respects with the requirements of this subchapter[.]" 8 U.S.C. § 1440(b). As to legislative intent, CIS writes, "It is difficult to believe that Congress would explicitly waive non-controversial requirements like the five-year residency requirement, but fail to even mention [that it intended to allow aggravated felons to naturalize] in any terms and understand that courts would simply read that exception into the statute."

Although this is an issue of first impression for this court, some of our sister circuits have considered similar cases. The Second Circuit, using *Chevron* deference, found that the agency's determination that § 1440 veterans still needed to show good moral character before naturalizing was reasonable. *Nolan*, 334 F.3d at 198 ("Notwithstanding Congress's desire to reward aliens who have served the United States in its Armed Forces, it hardly seems unreasonable for the INS to have inferred that Congress would not have intended to single out persons trained and/or experienced in physical confrontations for elimination of the requirement of good moral character.").

The Ninth Circuit also reviewed a similar issue in *Santamaria-Ames v. INS*, 104 F.3d 1127, 1130 (9th Cir. 1996). The Ninth Circuit found that § 1440 did, indeed,

require aliens who had served in wartime to prove good moral character before becoming naturalized citizens. Although he was a wartime veteran, the petitioner in that case had an extensive criminal record. He was denied naturalization under § 1440 because he had not shown good moral character. The petitioner did not claim, as O'Sullivan does, that the good moral character requirement is waived for wartime veterans. Instead, he claimed that the court could only consider his actions during the year prior to his naturalization application when determining whether he possessed good moral character. The Ninth Circuit held, "[T]he plain meaning of [§1440] . . . indicate[s] that conduct prior to the one-year regulatory period may be examined. Because servicemen and servicewomen are not exempt from section 1427's good moral character requirements, 8 U.S.C. § 1427(e) applies to determinations of good moral character under section 1440." *Santamaria-Ames*, 104 F.3d at 1130.

Most recently, the Fifth Circuit addressed the interplay between § 1440 and § 1427's good moral character requirement in *Lopez v. Henley*, 416 F.3d 455 (5th Cir. 2005). That case, like the Second Circuit's case in *Nolan*, arose as an appeal of an order of deportation, not as a petition for review of the denial of a naturalization petition. Consequently, the court appropriately deferred to the CIS's interpretation of the statute, finding it reasonable. The Fifth Circuit's analysis was parallel to the analysis found in *Nolan*.

Like our sister circuits, we find that § 1440 does not excuse alien wartime veterans from showing good moral character before naturalizing. Unlike O'Sullivan, we do not interpret the good moral character requirement as a subset of the residency requirement. The good moral character requirement does not disappear for an alien who no longer needs to reside in this country before naturalizing merely because it is found in a subsection with the heading "residence." Indeed, even if the requirement must

only be interpreted in light of the language in § 1427(a), the statute requires good moral character to be shown "during all periods *mentioned* in the subsection," not "during the period of time an alien is required to have lived in the United States before naturalizing." 8 U.S.C. § 1427(a)(3). The five year time frame is still *mentioned* in the subsection, even if that time frame does not apply to a specific alien. Aside from that nuance, the statute is clear that in order to naturalize, an alien must show that he *still is* of good moral character. *Id.* This is not tied to a residency period.

Section 1427(e) also lends support to the notion that Congress viewed the good moral character requirement as distinct from the residency requirement. In that section, the statute reads, "In determining whether the applicant has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this section, the Attorney General shall not be limited to the applicant's conduct during the five years preceding the filing of the application[.]" 8 U.S.C. § 1427(e). It is noteworthy that Congress separated "good moral character" from "the other qualifications for citizenship specified in subsection (a) [i.e., the residency requirements]." This indicates that the legislature viewed the two requirements as distinct.

O'Sullivan's arguments regarding 8 U.S.C. §1439, which sets out the naturalization requirements for peacetime veterans, fail to persuade us that the foregoing analysis is incorrect. Although § 1439 explicitly discusses good moral character, it does so only in contexts that are relevant only to peacetime veterans. Unlike wartime veterans, peacetime veterans must serve in the military for one full year and apply within six months of discharge, or while still serving in the armed forces. Therefore, the military has records of the recent activity of these aliens. Wartime veterans, on the other hand, can apply for naturalization years after their

tour of duty is completed. It is therefore entirely logical that Congress would consider military records much more relevant to the current good moral character of a peacetime veteran than a wartime veteran. Therefore, Congress has allowed aliens to show good moral character during their recent service through military records. Congress mentions good moral character in § 1439 in the context of this shortcut. It is also logical for Congress to specify that good moral character for all periods when an alien was not in service must be alleged in the naturalization application, and that the military records shortcut cannot be used to prove good moral character for any periods between military service.

These concerns were not present for wartime veterans. Their military service can be much shorter and further in time from the date the alien files for naturalization; therefore military records could be significantly less helpful in determining their current moral character. It stands to reason, then, that Congress would not set hard-and-fast rules on the use of military records as a means for wartime aliens to prove good moral character.

We therefore hold that the 8 U.S.C. §§ 1427 and 1440 require wartime veterans to show that they possess good moral character before they may become naturalized citizens of the United States.

3.  *Does § 1440 excuse qualifying aliens who were convicted of aggravated felonies from the permanent bar to good moral character found in 8 U.S.C. § 1101(f)(8)?*

O'Sullivan argues that even if § 1440 does not excuse wartime veterans from showing good moral character, it at least excuses them from the aggravated felony bar in 8 U.S.C. § 1101(f)(8). That subsection specifies, "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral

character is required to be established, is, or was . . . one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43) of this section)." 8 U.S.C. § 1101(f)(8).

O'Sullivan concedes that his conviction qualifies as an aggravated felony under the definition in 8 U.S.C. § 1101(a)(43). He argues, however, that § 1101(f)(8)'s statutory bar to a good moral character finding does not apply to him. Again, his argument is based on the language, "during the period for which good moral character is required to be established." He argues that no period is specified for wartime veterans, and therefore the bar does not apply to him. Assuming that the statute requires some sort of moral character showing, he argues, he should only be required to show that he "is," at the time of the application, a person of good moral character. He therefore requests that the proceedings be remanded to the district court, with instructions to conduct a hearing on O'Sullivan's current moral character, notwithstanding his prior criminal activity.

CIS replies that its own regulation, 8 C.F.R. § 329.2, requires wartime veterans to show good moral character for a period of one year prior to filing a naturalization petition. During that year, O'Sullivan was a "person who at any time" had been convicted of an aggravated felony under 8 U.S.C. § 1101(f)(8). Therefore, the agency argues, O'Sullivan is clearly barred from ever making a showing that he meets the good moral character requirement of naturalization.

O'Sullivan believes that 8 C.F.R. § 329.2 is beyond the agency's statutory authority and is therefore invalid. He claims that the agency is attempting to "create a good moral character period out of whole cloth." We do not share his view. The one year time frame in the CIS regulation fills a statutory gap in a perfectly logical manner. Since peacetime veterans are required to show good moral character for one

year, and the period for which a wartime veteran must show good moral character remains unspecified, it is quite reasonable to extend the one year period to wartime veterans as well. This regulation is consistent with the statute, and is necessary to allow the agency to administer Congress's naturalization scheme. Agency officials must know which period is relevant for their good moral character analysis, and applicants must know for what period they carry the burden of proving good moral character. We therefore find the regulation to be a valid exercise of delegated power.

We are also persuaded that the aggravated felony bar of 8 U.S.C. § 1101(f)(8) applies to wartime veterans by the Second Circuit's logic in *Boatswain v. Gonzales*, 414 F.3d 413 (2d Cir. 2005). That court wrote:

> Section 1101(f) comes at the outset of chapter twelve and establishes an important restriction on the definition of "good moral character," as the term is used throughout the chapter. Section 1101(f) does not say that we are to apply it to some parts of chapter twelve but not others, although such a limitation, had it been intended, would surely have warranted express pronouncement and could have been easily included. Taken in context, there is no reason to believe that § 1101(f)'s reference to "the period for which good moral character is required to be established," is anything more than an acknowledgment that the various provisions of chapter twelve attach different chronological conditions to the good moral character requirement contained in each. Thus, even accepting Boatswain's argument that § 1440 requires an applicant to demonstrate good moral character only at the moment of application . . . the corresponding "period," by any natural reading of the statute, would be that particular moment in time.

*Boatswain*, 414 F.3d at 418.

The Ninth Circuit reached a similar conclusion in *Castiglia v. INS*, 108 F.3d 1101 (9th Cir. 1997). In that case, the court called an argument almost identical to O'Sullivan's "nonsense." *Castiglia,* 108 F.3d at 1103. It read the statute's reference to being convicted "at any time" of an aggravated felony to mean "at any time at all." *Id.* Because the statute begins with the constrained time period "during the time period for which good moral character is required to be established," and only later adds "at any time," the court believed that the phrase "at any time" was meant to expand the significance of an aggravated felony conviction, even one entered outside of the general good moral character time frame. *Id.*

*Castiglia* is much more relevant to the current issue than its predecessor, upon which O'Sullivan relies, *Santamaria-Ames v. INS*, 104 F.3d 1127 (9th Cir. 1996). While it is true that the court in that case remanded the proceedings to the district court to determine if the applicant was currently a person of good moral character, the aggravated felony bar in § 1101(f)(8) was not at issue in that case. *Castiglia*, 108 F.3d at 1102 ("Castiglia confronts a statute not raised in *Santamaria-Ames:* 8 U.S.C. § 1101(f)(8).").

We, like the other courts that have reviewed this issue, conclude that the aggravated felony bar in 8 U.S.C. § 1101(f)(8) applies to wartime veterans applying to be naturalized citizens under § 1440.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of O'Sullivan's petition for naturalization.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*