In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3008

MAHVASH AKRAM,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A096 769 035

ARGUED APRIL 1, 2013—DECIDED JULY 9, 2013

Before BAUER, KANNE, and TINDER, *Circuit Judges*.

KANNE, *Circuit Judge*. The Immigration and Nationality
Act ("INA"), Pub. L. 82-414, 66 Stat. 163, as amended,
8 U.S.C. § 1101 *et seq.*, is a bit of a beast. It is not known
for being warm or cuddly; words like "intricate" and
"Byzantine" come more readily to mind. *Zeqiri v. Mukasey*,
529 F.3d 364, 370 (7th Cir. 2008). Nor is it known for
being easy to understand; we have often remarked on its

fiendish complexity. *See, e.g.*, *O'Sullivan v. USCIS*, 453 F.3d 809, 812 (7th Cir. 2006); *Muhur v. Ashcroft*, 382 F.3d 653, 656 (7th Cir. 2004); *Asani v. INS*, 154 F.3d 719, 727 (7th Cir. 1998). But even the INA has room for a human touch: it has the potential to bring families together to share in the American dream.

This case demonstrates both the INA's tangled construction and its tender heart. Mahvash Alisha Akram came to this country in 2006. She hoped to join her recently remarried mother and become a lawful permanent resident. Her hopes were dashed when she ran headlong into a regulatory wall. She now argues that the regulation that thwarted her cannot stand. Because we find that the regulation at issue directly conflicts with the will of Congress, we agree with Akram and grant her petition for review.

## I. BACKGROUND

The INA gives special immigration preferences to aliens with relatives in the United States. *See, e.g.*, 8 U.S.C. §§ 1151-1154. These preferences allow aliens to rejoin their families in the United States by making them eligible for permanent immigrant visas. Unfortunately, it sometimes takes months or years for permanent immigrant visas to be processed. *See, e.g.*, U.S. Dep't of State, Bureau of Consular Affairs, *Family-based Immigrant Visas*, http://travel.state.gov/visa/immigrants/types/types_1306.html (last visited July 1, 2013); U.S. Dep't of State, Bureau of Consular Affairs, *Immigrant Visa for a Spouse of*

*a U.S. Citizen (IR1 or CR1)*, http://travel.state.gov/visa/ immigrants/types/types_2991.html (last visited July 1, 2013). That delay means that people applying for visas to join their families in the United States generally must spend long periods waiting *outside* the United States for their visa applications to be processed.

This wait can be particularly hard on people who are separated from their spouses and children. Congress responded to this problem in two ways. The first is 8 U.S.C. § 1101(a)(15)(K), which gives short-term, non-immigrant visas to the spouses and fiance(e)s of U.S. citizens, as well as to the children of those spouses and fiance(e)s. It is apparently much faster to issue a non-immigrant visa than it is to issue a permanent immigrant visa. A short-term, non-immigrant visa therefore allows an alien to enter the United States faster than she would otherwise be able.

Section 1101(a)(15)(K) makes an alien eligible for a non-immigrant visa if he or she:

> (i) is the fiancee or fiance of a citizen of the United States . . . and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after admission;

> (ii) has concluded a valid marriage with a citizen of the United States . . . who is the petitioner, is the beneficiary of a petition to accord a status under section 1151(b)(2)(A)(I) of this title that was filed under section 1154 of this title by the petitioner, and seeks to enter the United States to

await the approval of such petition and the avail-ability to the alien of an immigrant visa; or

(iii) is the minor child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien[.]

*Id.* These temporary, non-immigrant visas are called "K visas." There are four categories:

- K-1: fiance(e)s of United States citizens;

- K-2: minor children of K-1s;

- K-3: spouses of United States citizens;

- K-4: minor children of K-3s.

*In re Sesay*, 25 I. & N. Dec. 431, 433 n.3 (BIA 2011) (*citing* 8 C.F.R. § 214.1(a)(1)(v), (a)(2)). The last two, K-3 and K-4 visas, are particularly relevant here.

Congress's second response to the problem of separa-tion of spouses and children is 8 U.S.C. § 1255. That section gives the Attorney General the power to "adjust" the status of an alien already present in the United States from non-immigrant status to immigrant status without the alien having to return to his or her home country. *See* 8 U.S.C. § 1255(a); *Benslimane v. Gonzales*, 430 F.3d 828, 832-33 (7th Cir. 2005); *Succar v. Ashcroft*, 394 F.3d 8, 22 (1st Cir. 2005). Taken together with the K visa system, ad-justment of status allows an alien spouse, fiance(e), or child to enter the United States temporarily while her permanent visa is being processed. Once the alien's application for a permanent visa is complete, the alien may change her status from non-immigrant to

immigrant without having to leave the country first. In short, K visas and adjustment of status allow aliens to wait out the procedural slog with their families in the United States.

Petitioner Mahvash Alisha Akram is a citizen of Pakistan, as are her mother and her younger sister. Akram's mother married Farhan Siddique, a United States citizen, outside the United States on July 4, 2005. Akram was eighteen years old at the time. After the marriage, Siddique wanted to move his new wife and stepchildren to the United States as permanent immigrants. Accordingly, Siddique requested K visas so his family could wait for their permanent visas in the United States instead of Pakistan. He also started the ball rolling on obtaining permanent visas for his family by filing alien relative petitions on their behalf. These petitions—called "I-130 petitions"—establish a formal family relationship to a U.S. citizen or a lawful permanent resident. Thus, Siddique's I-130 petition would, if granted, establish a formal relationship between Siddique and his new family members in the eyes of the U.S. government. 8 C.F.R. § 204.1(a)(1). That relationship, in turn, would make his family eligible for immigrant visas as "immediate relatives" of a U.S. citizen. 8 U.S.C. § 1151(b)(2)(A)(i).

Akram's mother duly received a K-3 visa, and her I-130 petition was granted at a later date. Akram's younger sister received a K-4 visa and also had her I-130 petition granted. Akram, however, found herself in a strange situation—her request for a K visa was granted, but her I-130 petition was denied.

This odd outcome arose from Akram's age. As discussed, an alien is eligible for a K-4 visa if she is the "minor child" of a K-3 visa-holder and is "accompanying, or following to join," the K-3. 8 U.S.C. § 1101(a)(15)(K)(iii). For K-visa purposes, the term "minor child" means an unmarried son or daughter who is under twenty-one years old. *See* 8 U.S.C. § 1101(b)(1) (defining "child"); *In re Le*, 25 I. & N. Dec. 541, 550 (BIA 2011) (applying definition of "child" in 8 U.S.C. § 1101(b)(1) to the term "minor child" under § 1101(a)(15)(K)(iii)); *accord Carpio v. Holder*, 592 F.3d 1091, 1098 (10th Cir. 2010). Akram was eighteen years old and unmarried when her mother received a K-3 visa. Accordingly, Akram was eligible for a K-4 visa as her mother's "minor child," 8 U.S.C. § 1101(a)(15)(K)(iii), and Akram received her visa on February 28, 2006.

Now here is the strange part: although Akram was her mother's "minor child" for K-visa purposes, she was not Siddique's "child" for I-130 purposes. The reason is that Akram is Siddique's *stepdaughter*, not his biological daughter. A stepchild qualifies as a "child" for immigration purposes only if she "had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred." 8 U.S.C. § 1101(b)(1)(B). Because Akram was already eighteen when her mother married Siddique, she was too old to be *his* "child," even though she was still her mother's "minor child." As a result, Akram could not show a family relationship with Siddique, and the I-130 petition that Siddique filed on her behalf was denied on January 23, 2006.

Akram accordingly received permission to be in the United States, but only temporarily, until March 21, 2007, as a K-4 visa-holder. Akram moved to the United States to join her mother and applied to adjust her status and become a lawful permanent resident. Her application was denied—because no I-130 petition had been granted on Akram's behalf, she was not eligible to become a permanent immigrant as the relative of a U.S. citizen (i.e., Siddique). In the meantime, Akram's mother became a lawful permanent resident and filed her own I-130 alien relative petition on Akram's behalf on June 24, 2008. *See* 8 U.S.C. § 1153(a)(2) (providing visa eligibility for "unmarried sons and unmarried daughters of permanent resident aliens"). So far as we know, that petition and its related paperwork are still working their way through the system. Nevertheless, Akram's mother's petition is important, and we will return to it later in our opinion.

Akram remained in the United States after her K-4 visa expired, and removal proceedings against her began on April 17, 2009. Akram conceded removability but argued that she should be able to stay and adjust her status. In support, Akram pointed to the differences between how the children of fiance(e)s (K-2s) and the children of spouses (K-4s) become permanent residents. Under current regulations, K-2s need not separately apply for permanent immigrant visas. After she has received a K-2 visa, a K-2 may adjust status and become a permanent resident as soon as her parent's marriage is complete; she *does not* need to file an I-130 immediate relative petition. *See* 8 C.F.R. § 214.2(k)(6)(ii); *cf. Sesay*, 25 I. & N. Dec.

at 439 ("there is no requirement for a Form I-130 immigrant visa petition to be filed . . . for the fiancé(e)"). K-4s, on the other hand, must pass through a much narrower visa petitioning process. Under current regulations, *the only way* that a K-4 can adjust her status to that of a permanent immigrant is by filing an I-130 petition and thereby showing that she is the "spouse or child of the U.S. citizen who originally filed the petition for that alien's K-3/K-4 status." 8 C.F.R. § 245.1(i).[1]

That is a lot to wrap your head around, so we will illustrate the difference. Akram's mother married Siddique abroad. Thus, Akram's mother received a K-3 visa, and Akram received a K-4 visa. Akram now wants to adjust status and become a lawful permanent resident because she has immediate relatives in the United States. But Siddique cannot serve as that relative because Akram is not Siddique's "child." 8 U.S.C. § 1101(b)(1)(B). Nor can someone else (like Akram's mother, for instance) serve as that relative. That is because, under 8 C.F.R. § 245.1(i), the *only* way that a K-4 may adjust status is if *the sponsoring citizen* (i.e., Siddique) successfully filed

---

[1]  Note, however that 8 C.F.R. § 245.1(i) does not prevent Akram from *ever* obtaining an immigrant visa. As the government explains, "Akram should be able to immigrate to the United States through the I-130 petition filed by her mother, assuming that she is otherwise admissible." (Appellee's Br. at 50 n.12.) Instead, 8 C.F.R. § 245.1(i), prevents Akram from *adjusting status*. In other words, it requires her to leave the United States and wait (perhaps for years) for processing in her home country before receiving an immigrant visa.

an I-130 petition on the K-4's behalf. As a result, it is impossible for Akram to adjust her status from that of a K-4 to that of a lawful permanent resident.

Now suppose that, instead of marrying Siddique abroad, Akram's mother decided to marry Siddique in the United States. Instead of receiving a K-3 visa, Akram's mother would have received a K-1 fiancee visa. And instead of receiving a K-4 visa, Akram would have received a K-2 visa. After the marriage, there would have been no need for Akram to show that Siddique—or anyone else—was her relative. Akram would have been able to adjust her status immediately. *See* 8 C.F.R. § 214.2(k)(6)(ii); *see also Kondrachuk v. USCIS*, No. C 08-5476 CW, 2009 WL 1883720, at *2 (N.D. Cal. June 30, 2009) (explaining immediate adjustment of status under 8 C.F.R. § 214.2(k)(6)(ii)). In this alternate universe, Akram would, in all likelihood, already be a lawful permanent resident. This stark difference in outcomes, Akram argued, is irrational, contrary to statute, and unconstitutional.

The Immigration Judge ("IJ") held that Akram could not adjust status through Siddique because she is not his "child." The IJ also held that 8 C.F.R. § 245.1(i) bars Akram from adjusting status by any means other than through Siddique and that the IJ lacked jurisdiction to declare 8 C.F.R. § 245.1(I) unconstitutional or contrary to statute. The IJ therefore found Akram ineligible to adjust her status and granted her voluntary departure in lieu of removal. *See* 8 U.S.C. § 1229c.

Akram appealed to the Board of Immigration Appeals ("BIA"). Like the IJ, the BIA concluded that Akram

could not adjust status as Siddique's "child" and that it lacked the authority to declare 8 C.F.R. § 245.1(i) unconstitutional or *ultra vires*. *See In re Akram*, 25 I. & N. Dec. 874, 880 (BIA 2012). The BIA also denied Akram's motion to remand the case to allow her to adjust status as a relative of her mother, who by that time had become a lawful permanent resident. *Id.* at 882. The BIA reasoned that Akram could not adjust status through her mother because 8 C.F.R. § 245.1(i) barred Akram from adjusting status on any basis other by a relationship to Siddique. *Akram*, 25 I. & N. Dec. at 882. Akram now petitions for review, arguing, once again, that 8 C.F.R. § 245.1(i) is unconstitutional and contrary to the will of Congress.[2]

## II. ANALYSIS

Under current regulations, Akram cannot adjust status "in any way other than as a spouse or child of the U.S. citizen who originally filed the petition for that alien's K-3/K-4 status." 8 C.F.R. § 245.1(i). Siddique was the U.S. citizen who originally filed the petition for Akram's K-4 status. But, as discussed, Akram does not qualify as Siddique's "child" because she was eighteen when Siddique married her mother. 8 U.S.C. § 1101(b)(1)(B). Accordingly, she cannot adjust status as Siddique's child. And, because 8 C.F.R. § 245.1(i) bars

---

[2] Akram also challenges an identical regulatory provision at 8 C.F.R. § 1245.1(i). For simplicity's sake, we will use "8 C.F.R. § 245.1(i)" to refer to both provisions.

her from adjusting status in any other way, the BIA held that Akram cannot adjust status at all.

Akram attacks this holding on two fronts. First, she argues that 8 C.F.R. § 245.1(i) is contrary to statute. As a result, Akram says that she should be able to adjust status without benefitting from an I-130 petition, or, alternatively, by having her mother, who is now a lawful permanent resident, file an I-130 petition on Akram's behalf. Second, Akram argues that, even if 8 C.F.R. § 245.1(i) is statutorily permissible, it is nevertheless so irrational that it violates the Fourteenth Amendment's Equal Protection Clause. Judicial restraint requires us to avoid addressing constitutional questions where possible, *see Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011), so we will take up the statutory question first.

Akram challenges both an administrative regulation that has gone through notice-and-comment rulemaking and a precedential BIA opinion. As a result, we review her challenge through the lens of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (rules promulgated through notice-and-comment rulemaking entitled to *Chevron* deference); *Escobar v. Holder*, 657 F.3d 537, 542 (7th Cir. 2011) (precedential BIA opinions interpreting governing legal standards entitled to *Chevron* deference). Our first task is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are

contrary to clear congressional intent." *Id.* at 843 n.9. Thus, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.*; *accord City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). If, on the other hand, the statute is ambiguous, then we "must defer to an agency's reasonable interpretation of the statute*." Sarmiento v. Holder*, 680 F.3d 799, 802 (7th Cir. 2012) (*citing Chevron*, 467 U.S. at 842-44); *accord Arlington,* 133 S. Ct. at 1868.

We do not think that 8 C.F.R. § 245.1(i) can be squared with the will of Congress. Several statutes are relevant here, but the most important is 8 U.S.C. § 1101(a)(15)(K), which created the K visa category. As we have already discussed, this statute provides that an alien is eligible for a non-immigrant visa if he or she:

> (i) is the fiancee or fiance of a citizen of the United States . . . and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after admission;

> (ii) has concluded a valid marriage with a citizen of the United States . . . who is the petitioner, is the beneficiary of a petition to accord a status [as an immediate relative], and seeks to enter the United States to await the approval of such petition and the availability to the alien of an immigrant visa; or

(iii) is the minor child of an alien described in [clause (ii)] and is accompanying, or following to join, the alien[.]

*Id.*

It is not hard to see what Congress was aiming for. The purpose of a K visa is to allow fiance(e)s, spouses, and children of citizens to enter the United States temporarily while awaiting permanent visas. Subsection (ii), for instance, conditions availability of a K-3 visa on the need for the applicant to await "the availability . . . of an immigrant visa." *Id.* Subsection (iii) uses different language, but it achieves the same result. It conditions the availability of a K-4 visa on the child's desire to "accompany[], or follow[] to join" their parent. The most natural reading of this language is that the K-4 will join his or her parent *permanently*. Indeed, the BIA held as much in this very case; it stated that the purpose of all K visas is to "to confer nonimmigrant status to aliens who [are] awaiting the availability of an immigrant visa*." Akram*, 25 I. & N. Dec. at 879 (internal quotation marks omitted).

That does not mean that *all* K visa recipients will someday become lawful permanent residents, of course. A K-3 visa lasts long enough to allow "the approval of" an I-130 petition to accord status as a spouse. 8 U.S.C. § 1101(a)(15)(K)(ii). If the I-130 petition were denied (because the marriage was a sham, for instance), then the K-3 visa would terminate without the K-3 becoming a lawful permanent resident. In such a case, the K-4's derivative visa would expire as well because there

would be nobody left for the K-4 to "follow[] to join."
8 U.S.C. § 1101(a)(15)(K)(iii).

But, under normal circumstances, a K-4 visa-holder
will become a lawful permanent resident. Nothing in
the statute suggests that Congress intended for K-4s
like Akram to come to the United States as mere
temporary visitors. Indeed, the fact that Congress
created separate provisions for temporary visitors, *see*
8 U.S.C. § 1101(a)(15)(B), suggests precisely the opposite.

So to review, the text and structure of § 1101(a)(15)(K)(iii)
suggest that Congress intended K-4s to enter the
United States and then later adjust status to become
lawful permanent residents. As discussed, Akram wants
to do exactly that. By requiring Akram to adjust *only*
by way of Siddique, 8 C.F.R. § 245.1(i) frustrates that
goal. Accordingly, 8 C.F.R. § 245.1(i)'s limitations on
K visas find no support in subsection K itself.

The question, then, is whether some other statu-
tory provision supports 8 C.F.R. § 245.1(i)'s require-
ment that K-4s adjust status *only* by way of the U.S.
citizen who petitioned for their K visa. The government
claims that several statutes support this requirement.
It begins with 8 U.S.C. § 1255(d), which provides that
a K visa-holder may only adjust status "as a result
of the marriage of the nonimmigrant (or, in the case of a
minor child, the parent) to the citizen who filed the
petition to accord that alien's nonimmigrant status
under section 1101(a)(15)(K) of this title." 8 U.S.C.
§ 1255(d). The similarity between this provision and
8 C.F.R. § 245.1(i) is obvious — recall that 8 C.F.R. § 245.1(i)
provides that a K-3 or K-4 cannot adjust status "in any

way other than as a spouse or child of the U.S. citizen who originally filed the petition for that alien's K-3/K-4 status." Latching on to what it describes as the "plain" statutory language, the government argues 8 U.S.C. § 1255(d) and 8 C.F.R. § 245.1(i) are essentially identical. Thus, the government concludes that 8 U.S.C. § 1255(d) supports 8 C.F.R. § 245.1(i)'s restrictions.

But § 1255(d) does not support the government's reading. Nothing in § 1255(d) requires K-4s to adjust status "as a . . . child of the U.S. citizen who originally filed the petition." 8 C.F.R. § 245.1(i). To the contrary, § 1255(d) requires K-4s to adjust status "*as a result of the marriage* of . . . the parent . . . to the citizen." 8 U.S.C. § 1255(d) (emphasis added). In other words, it is the *marriage*, not the relationship to the U.S. citizen, that defines the statutory limitation. *See Choin v. Mukasey*, 537 F.3d 1116, 1119 n.4 (9th Cir. 2008) ("There is no question that the plain language of the statute bars K visaholders from adjusting to permanent resident status on any basis other than *the marriage* to the citizen who petitioned on their behalf.") (emphasis added); *cf. Markovski v. Gonzales*, 486 F.3d 108, 110 (4th Cir. 2007) ("On its face, subsection (d) prohibits an alien who arrived on the K-1 fiancé visa from adjusting his status on any basis whatever save for *the marriage* to the K-1 visa sponsor.") (emphasis added).

This textual difference is crucial. Section 1255(d) unquestionably bars K visa-holders from adjusting status for reasons unrelated to the marriage that precipitated the visa. Thus, a K-1 who enters the United States as the fiancee of one man cannot adjust status through a mar-

riage to another man. *Birdsong v. Holder*, 641 F.3d 957, 957-58, 960-61 (8th Cir. 2011). Similarly, a K-4 who enters to join her parent cannot adjust status by way of *her own* marriage to a U.S. citizen. *In re Valenzuela*, 25 I. & N. Dec. 867, 868-71 (BIA 2012). Attempts to adjust status under these circumstances squarely conflict with the requirement that K visa-holders adjust status "as a result of the marriage" that formed the basis for the K visa. 8 U.S.C. § 1255(d).

But that is not what Akram wants to do. She wants to "follow[] to join" her mother, as 8 U.S.C. § 1101(a)(15)(K)(iii) provides. And she wants to adjust her status either (1) like a K-2, as a direct result of her mother's marriage; or (2) through her mother, who became a permanent resident as a direct result of her marriage to Siddique.[3] Either of these mechanisms

---

[3] Seeking a visa through her mother would be possible, although it would likely involve a longer wait. Federal statute provides that an alien may adjust status only if there is a visa "immediately available" for her. 8 U.S.C. § 1255(a). Unlike visas for children of U.S. citizens, *see* 8 U.S.C. § 1151(b)(2)(A)(1), visas for the children of lawful permanent residents are subject to yearly numerical caps, *see* 8 U.S.C. § 1153(a)(2). As a result, visas are not always "immediately available," 8 U.S.C. § 1255(a), for children of lawful permanent residents. Instead, a child seeking a visa through her lawful permanent immigrant parent generally must wait in line (metaphorically, at least) for a visa to become available. *See* USCIS, *Visa Availability & Priority Dates*, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextchannel=
(continued...)

would be a "as a result of the marriage of" Akram's mother to Siddique. 8 U.S.C. § 1255(d). Contrary to the government's argument, § 1255(d)'s text is entirely consistent with allowing Akram to adjust status in the ways she proposes. Under § 1255(d)'s plain language, it is the K-3's *marriage*, not the K-4's relationship to the petitioning citizen, that matters.

Other portions of the INA support this plain-language reading. Consider 8 U.S.C. § 1186a, which places conditions on permanent residence for K visa immigrants. *See Carpio*, 592 F.3d at 1098-1100 (interpreting § 1255 in light of § 1186a). Like § 1255(d), § 1186a defines a K-3 "alien spouse" in terms of a relationship to a U.S. citizen or permanent resident. *See* 8 U.S.C. § 1186a(h)(1)(A) ("spouse of a citizen of the United States"); 8 U.S.C. § 1186a(h)(1)(B) ("fiancee or fiance of a citizen of the United States"); 8 U.S.C. § 1186a(h)(1)(C) ("spouse of an alien lawfully admitted for permanent residence"). But, also like § 1255(d), § 1186a refers to K-4 *children* in terms of their parent's *marriage*—8 U.S.C. § 1186a(h)(2) defines an "alien son or daughter," in part, as "an alien

---

(...continued)
aa290a5659083210VgnVCM100000082ca60aRCRD&vgnextoid=
aa290a5659083210VgnVCM100000082ca60aRCRD (last visited July 1, 2013). But this fact does not necessarily prevent Akram from adjusting status via her lawful permanent resident mother. Consistent with the underlying purpose of the K visa system, the government could allow Akram to remain in the United States on a K-4 visa until she reaches the front of the line and an immigrant visa becomes "immediately available" to her by way of her mother.

who obtains the status of an alien lawfully admitted for permanent residence . . . by virtue of being the son or daughter of an *individual through a qualifying marriage*." *Id.* (emphasis added).

Two parts of this text stand out. The first is the use of the term "individual." *Id*. That word contrasts with the words that § 1186a uses to refer to spousal immigrants. Where spouses are concerned, § 1186a uses more specific terms like "citizen" or "alien lawfully admitted for permanent residence." *See* 8 U.S.C. § 1186a(c)(4)(C), (h)(1)(A)-(C). Surely Congress also could have used these terms in their discussion of K-4 children. But instead, Congress used a more general term—"individual"—that encompasses U.S. citizens, U.S. permanent residents, *and alien parents*. " 'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Moral-Salazar v. Holder*, 708 F.3d 957, 961 (7th Cir. 2013) (*quoting Kucana v. Holder*, 558 U.S. 233, 249 (2010)). Thus, Congress's choice of words suggests that a K-4 may be defined by a relationship to their *alien parent* in addition to their citizen stepparent. That, in turn, suggests that Congress did not intend for a relationship with a citizen stepparent to be the *only* way for a K-4 to adjust status.

Second, and perhaps more important, is § 1186a's emphasis on marriage. Like § 1255(d), § 1186a(h)(2) presupposes that K-4 children will obtain status not

through a relationship to a citizen, but rather "through a qualifying marriage." This emphasis on marriage in § 1186a further suggests that, in drafting § 1255(d), Congress intended to allow K-4s to adjust status as a result of their parent's marriage and not merely based on a relationship to a citizen.

The purpose and history of § 1255(d) also support this reading. Before § 1255(d) was passed, "even a sham marriage to a United States citizen provided a ready and immediate path to lawful permanent resident status." *Choin*, 537 F.3d at 1120. Accordingly, Congress passed the Immigration Marriage Fraud Amendments of 1986, Pub. L. No. 99-639, 100 Stat. 3537 (1986). These amendments were designed "to deter immigration-related marriage fraud and other immigration fraud," *Choin*, 537 F.3d at 1120, by eliminating the "streamlined, nearly automatic adjustment-of-status procedure for K-1 visa holders." *Birdsong*, 641 F.3d at 960. Thus, § 1255(d) provides, in essence, that (1) a person who is let into the country to marry a citizen must actually marry that citizen; and (2) a person who is let into the country to join her parents must actually join her parents.

We can see why Congress would endorse these sensible principles. But why would Congress endorse the result in this case? Why admit a class of people into the country—using a visa designed to reunite families—only to give them the boot after a few years? What anti-fraud purpose does that serve?

None, it turns out. After the Immigration Marriage Fraud Amendments were passed, it became clear that they had unintended consequences on K visa immi-

grants. As the Department of Homeland Security has recognized, the amendments "created a gap regarding the procedure for a K-2 alien to adjust status to that of a person admitted for permanent residence." Memorandum from Michael L. Aytes, Assoc. Dir. of Domestic Ops. for USCIS, re: Adjustment of Status for K-2 Aliens (Mar. 15, 2007), *available at* http://www.uscis.gov/USCIS/ Laws/Memoranda/Static_Files_Memoranda/ k2adjuststatus031507.pdf (last visited July 1, 2013); *see also Kondrachuk*, 2009 WL 1883720, at *2; *Le*, 25 I. & N. Dec. at 550. This gap meant that "K-2 visa holders who [were] eighteen or older at the time of their K-1 parent's marriage [were] not considered immediate relatives of a U.S. citizen and [were] not eligible for an immediate visa." *Kondrachuk*, 2009 WL 1883720, at *2. And that was so "even though these children were given K-2 visas to enter the United States with their K-1 parent when they had already attained eighteen years of age." *Id.* In other words, K-2s were in the same predicament that Akram now finds herself in as a K-4. The response to this predicament was 8 C.F.R. § 214.2(k)(6)(ii), which provides an administrative means for K-2s to adjust status without demonstrating a relationship to a U.S. citizen. *Le*, 25 I. & N. Dec. at 549-50. In other words, both the BIA and the agency concluded that Congress intended to allow K-2s to adjust status even if they were already eighteen at the time of their parents' marriages.

It is unclear why the same administrative fix was not made for K-4s. Perhaps it is because the Immigration Marriage Fraud Amendments were passed in 1986, Pub. L. No. 99-639, 100 Stat 3537 (1986), and K-4 visas were not

created until 2000, *see* Legal Immigration Family Equity Act, Pub. L. 106-553, 114 Stat. 2762, at 2762A-114 (2000). The issue may simply have faded from attention in the intervening fourteen years. But whatever the reason for the lack of an administrative solution, we see no *statutory* reason for treating K-2s and K-4s so differently. After all, K-2 and K-4 visas arise from the exact same statutory language. *See* 8 U.S.C. § 1101(a)(15)(K)(iii).

And consider the bizarre upshot of the government's reading of § 1255(d)'s legislative history. Set aside for the moment the fact that § 1255(d)'s text does not actually require K-4s to adjust status by way of a U.S. citizen. If the statute *did* require K-4s to adjust status via a citizen, why not require K-2s to do the same? Consider again that, at the time Congress passed § 1255(d), the K-1 and K-2 categories existed, but the K-3 and K-4 categories did not. Why, in enacting § 1255(d), would Congress want to (1) *not* legislate regarding visa categories (K-1s and K-2s) that then existed, but nevertheless (2) impose additional burdens on visa categories (K-3s and K-4s) that *did not exist at the time*?

The only logical answer is that Congress did not intend § 1255(d) to prevent people in Akram's situation from adjusting status. Section 1255(d) does not require K-4s to adjust status by way of their petitioning stepparent. Instead, it merely requires them to adjust status "as a result of the marriage of" their parents. Akram's proposed methods of adjusting status both would satisfy that requirement. The structure and history of the statute further support her. That contrasts with the gov-

ernment's reading of § 1255(d), embedded in 8 C.F.R. § 245.1(i), that a K-4 may adjust status only by way of a relationship to the petitioning citizen. That reading is unmoored from § 1255(d)'s text, does nothing to further § 1255(d)'s purpose of fraud-prevention, and frustrates the underlying goals of the K visa system. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. We therefore conclude that 8 C.F.R. § 245.1(i)'s requirement that K-4s adjust status *only* by way of the sponsoring U.S. citizen is contrary to 8 U.S.C. § 1255(d) and 8 U.S.C. § 1101(a)(15)(K)(iii).

The government points to two other statutes in defense of 8 C.F.R. § 245.1(i), but neither supports the government's reading. The first provision is 8 U.S.C. § 1255(a), which provides that

> [t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

In other words, an alien may adjust status if (1) she applies for it; (2) she is eligible to immigrate permanently to the United States; and (3) an immigrant visa is immedi-

ately available to her.[4] The government then points to 8 U.S.C. § 1154(a)(1)(A), which provides that "any citizen of the United States claiming that an alien is entitled to classification by reason of [a familial or immediate relative relationship] may file a petition with the Attorney General for such classification," 8 U.S.C. § 1154(a)(1)(A)(i), unless the citizen has been convicted of a serious crime against a minor, 8 U.S.C. § 1154(a)(1)(A)(viii)(I)-(II).

The government argues that these two statutes, read together, support 8 C.F.R. § 245.1(i) by "unambiguously demonstrat[ing] that Congress intended nonimmigrant immediate relatives seeking adjustment of status to show immigrant visa eligibility and availability" by filing an I-130. (Appellee's Br. at 35.) But we do not see how. Section 1154(a)(1)(A) merely provides that a U.S. citizen *may* ask the government to treat her relatives as relatives. It does not require immigrants who have rela-

---

[4] Although 8 U.S.C. § 1255(a) gives the Attorney General "discretion" to adjust an alien's status, "[t]he mere fact that a statute gives the Attorney General discretion as to whether to grant relief after application does not by itself give the Attorney General the discretion to define eligibility for such relief." *Succar*, 394 F.3d at 10. Thus, we retain the authority to ensure that the Attorney General exercises his or her discretion within lawful bounds. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 444-45, 449-50 (1987) (invalidating administrative interpretation as contrary to congressional intent because it limited the Attorney General's discretion in ways not required by statute).

tives in the United States to apply for visas, or adjust status, on that basis *alone*. And 8 U.S.C. § 1255(a) says that aliens who want to adjust status must show they are eligible to immigrate and that there is a visa ready for them. Unimpeded by 8 C.F.R. § 245.1(i), Akram might be able to make that showing. She might, for instance, adjust status immediately like K-2s do under 8 C.F.R. § 214.2(k)(6)(ii). Or, as discussed, she might seek an immigrant visa through her mother. Neither 8 U.S.C. § 1255(a), nor 8 U.S.C. § 1154(a)(1)(A), support 8 C.F.R. § 245.1(i)'s requirement that K-4s adjust status *only* by way of a relationship to the petitioning citizen.[5]

The executive branch cannot decide, by rule or by decision, to abandon a duty that Congress has delegated to it. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 444-45, 449-50 (1987) (holding invalid, under prong one of *Chevron*, a BIA interpretation that limited the Attorney General's discretion in ways contrary to the will of Congress); *see also Chevron*, 467 U.S. at 843 n.9. Here, traditional tools of statutory construction indicate that Congress intended to give K-4s like Akram the opportunity to adjust status and join their parents in the United States. The regulation codified at 8 C.F.R. § 245.1(i), and the

---

[5] The BIA held that Akram was not eligible to receive an immigrant visa because of 8 U.S.C. § 1255(d) and 8 C.F.R. § 245.1(i). *See Akram*, 25 I. & N. Dec. at 882. It did not address whether Akram could otherwise meet § 1255(a)'s visa availability requirements. Accordingly, we leave to the BIA to determine on remand whether Akram ultimately will be able to satisfy those requirements.

BIA decision applying it, both deny Akram that oppor-
tunity. Because "Congress had an intention on the
precise question at issue, that intention is the law and
must be given effect." *Chevron*, 467 U.S. at 843 n.9. We
therefore hold that—insofar as they require K-4s to
adjust status via a relationship to a U.S. citizen instead
of merely "as a result of the marriage" of their parents—
8 C.F.R. § 245.1(i) and the BIA's decision applying
that rule are invalid.[6] Because this holding disposes of
the case, we need not address Akram's alternative argu-
ment that 8 C.F.R. § 245.1(i) is also unconstitutional.

That leaves only the question of relief. Akram asks us
to hold that she may adjust status in the manner of a K-2,
without filing an I-130. *See* 8 C.F.R. § 214.2(k)(6)(ii). In
the alternative, she asks us to hold that she may adjust
status via an I-130 filed by her mother, who has now
become a lawful permanent resident. But our role is

---

[6] The BIA's opinion relied almost entirely on 8 C.F.R. § 245.1(i).
However, a single sentence near the end of the opinion
suggests two other possible bases for its decision: 8 U.S.C.
§ 1255(d) and 8 C.F.R. § 1245.1(c)(6)(ii). *See Akram*, 25 I. & N. Dec.
at 882. To the extent that the BIA's decision also relied on
these provisions, its decision was still mistaken. As we have
already discussed at length, 8 U.S.C. § 1255(d) does not bar
Akram from adjusting status; it merely requires Akram to
adjust status "as a result of the marriage" of her parent. Simi-
larly, 8 C.F.R. § 1245.1(c)(6)(ii) provides that a K-4 must
adjust status "based upon the marriage of the K-3 spouse."
Accordingly, neither provision categorically prevents Akram
from adjusting status.

to review agency decisions; it is not to dictate decisions in the first instance. *See Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (*per curiam*); *INS v. Ventura*, 537 U.S. 12, 16 (2002) (*per curiam*); *Ghebremedhin v. Ashcroft*, 392 F.3d 241, 243-44 (7th Cir. 2004) (*per curiam*). Congress vested the Attorney General with the discretion to adjust an alien's status. *See* 8 U.S.C. § 1255(a). That discretion does not include the right to deny adjustment based on a rule that is contrary to the will of Congress. *See Cardoza-Fonseca*, 480 U.S. at 449-50; *Succar*, 394 F.3d at 10. But beyond that, we leave it to the Attorney General to decide whether, and how, Akram will be able to adjust status.

### III. CONCLUSION

We GRANT Akram's petition for review, REVERSE the decision of the BIA, and REMAND for proceedings consistent with this opinion.