**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4831
_____

SI MIN CEN,
                    Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                    Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA No. A200-377-255)
Immigration Judge: Honorable Frederic G. Leeds
_____

Argued: October 5, 2015

Before: SHWARTZ, KRAUSE, and GREENBERG, *Circuit Judges*

(Opinion filed: June 6, 2016)
_____

Scott E. Bratton, Esquire (Argued)
Margaret Wong & Associates
3150 Chester Avenue
Cleveland, OH 44114

*Counsel for Petitioner*

Jeffrey R. Meyer, Esquire
Robert M. Stalzer, Esquire (Argued)
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

The Immigration and Nationality Act (INA) allows a child under the age of twenty-one whose alien parent has married a U.S. citizen abroad to obtain a temporary "K-4" visa to accompany her parent to the United States and, based on the parent's marriage, to apply to adjust her status to that of a lawful permanent resident. On a petition for review of a decision of the Board of Immigration Appeals (BIA), we now consider the validity of a regulation that makes it impossible for a child who entered on such a visa to remain with her

family and adjust her status from within the United States if she was over the age of eighteen at the time of her parent's marriage. Because the regulation departs from the plain language of the INA, contravenes congressional intent, and exceeds the permissible scope of the Attorney General's regulatory authority, we conclude it is invalid. We therefore will grant the petition for review and will reverse and remand to the BIA for further proceedings.

I.  **Background**

As a general matter, aliens abroad who have relatives in the United States may be eligible to obtain lawful permanent residence, but because it can take months or even years for the pertinent paperwork to be processed, these aliens may spend significant time separated from their loved ones while they wait in their home countries for the appropriate visa approval. *See, e.g.*, 8 U.S.C. §§ 1151-1154; 146 Cong. Rec. 27,160 (2000) (describing the lengthy delays faced by those seeking relative-based visas). Congress sought to ameliorate this problem for the immediate family members of U.S. citizens through the creation, initially, of K-1 visas for alien fiancé(e)s of U.S. citizens and then, more recently, of K-3 visas for alien spouses of U.S. citizens. In addition, and of particular significance for this case, Congress also provided for K-2 and K-4 visas for, respectively, the minor children of fiancé(e)s and spouses, up to age twenty-one.[1]

---

[1] The statutes relevant to K-2 and K-4 visa holders refer to them as "minor child[ren]," 8 U.S.C. §§ 1101(a)(15)(K)(iii), 1255(d), a term the BIA has long held, and the parties do not dispute, has the same meaning as "child" under 8 U.S.C. § 1101(b)(1). *See, e.g.*, *In re Le*, 25 I.

3

Once reunited with their families stateside, aliens with one of these K-visas may apply for and, subject to the discretion of the Attorney General, attain lawful permanent residence without leaving the United States through a process called "adjustment of status." Petitioner in this case properly obtained a K-4 visa as the nineteen-year-old daughter of a K-3 alien spouse and accompanied her mother to the United States to live with her stepfather, a U.S. citizen, while Petitioner and her mother applied for adjustment of status. Petitioner's applications have been denied, however, on account of a regulation that effectively bars any child with a K-4 visa who was between the ages of eighteen and twenty-one at the time of her parent's marriage from obtaining lawful permanent residence without first returning overseas. Our analysis of Petitioner's challenges to the validity of this

_____

& N. Dec. 541, 547-50 (BIA 2011); *see also* 8 C.F.R. § 214.2(k)(3). "Child" is defined as "an unmarried person under twenty-one" who fits within one of the subcategories under § 1101(b)(1), some of which impose additional age requirements. For purposes of this case, Petitioner was born to her biological mother (by all representations, in wedlock) and thus is not subject to additional age restrictions. § 1101(b)(1)(A). Accordingly, our regular reference in this opinion to children under the age of twenty-one should not be construed to implicitly remove the additional age restrictions on accessing a K-visa that would accompany certain categories of children. *E.g.*, § 1101(b)(1)(E)(i) (generally restricting adopted children from the definition of "child" under the INA if they were over the age of sixteen at the time of the adoption). As discussed in more detail below, *infra* notes 11 & 15, we accept the BIA's interpretation of the term "minor child."

4

regulation requires an understanding of the statutory and regulatory regime that governs K-visa holders, as well as the factual and procedural history of Petitioner's case. We address each below.

## A. Statutory and Regulatory Context

The story of K-visas begins in 1970, when Congress created K-1 and K-2 visas to allow the fiancé(e)s of U.S. citizens and such fiancé(e)s' unmarried children under the age of twenty-one, respectively, to obtain temporary, nonimmigrant status. Assuming the fiancé(e) and the U.S. citizen married within three months, that status would allow the fiancé(e) and children to await processing of their applications for lawful permanent residence from within the United States. Act of Apr. 7, 1970, Pub. L. No. 91-225, § 1(b), 84 Stat. 116, 116. In their original form, K-1 and K-2 visas triggered automatic lawful permanent residence for the visa holders once the marriage was complete. *See id.* at § 3(b). This feature had the perverse effect, however, of encouraging fraudulent marriages whereby some aliens obtained K-1 visas and married U.S. citizens with the intention to dissolve the marriage once they obtained lawful permanent residence. *In re Sesay*, 25 I. & N. Dec. 431, 435-38 (BIA 2011) (describing this marriage fraud problem).

In 1986, Congress sought to curb such marriage fraud by passing the Immigration Marriage Fraud Amendments (IMFA), Pub. L. No. 99-639, 100 Stat. 3537 (1986), which replaced K-1 and K-2 aliens' streamlined method of obtaining lawful permanent residence with the more structured "adjustment of status" process. IMFA § 3(c); *see also Carpio v. Holder*, 592 F.3d 1091, 1094 (10th Cir. 2010) (describing the post-IMFA requirement that K-visa holders file an

5

application for adjustment of status in order to obtain lawful permanent residence). Since the passage of the IMFA, K-1 and K-2 aliens are required to apply to adjust their status like other aliens through the strictures of 8 U.S.C. § 1255(a), which gives the Attorney General the discretion to provide lawful permanent residence to certain aliens without requiring them to first return to their countries of origin. *See* IMFA § 3(c). K-visa holders' adjustment of status under § 1255(a) is constrained by 8 U.S.C. § 1186a, which renders an alien's permanent status conditional for two years, after which time the Government conducts an interview with the couple to reaffirm the legitimacy of the marital union; if the Government is satisfied, the status for both the alien spouse and her children becomes truly permanent. IMFA § 2.

To apply for status adjustment under § 1255(a), an alien must take three steps: (1) file an application to adjust status; (2) demonstrate eligibility under existing law to adjust status; and (3) show that a permanent visa is immediately available.[2] 8 U.S.C. § 1255(a). Once an application is filed,

---

[2] This third requirement refers to the limited number of permanent visas apportioned to a given nation. Spouses and children of U.S. citizens do not have to wait for such visas because a separate statute makes permanent visas always available to them regardless of their country of origin. 8 U.S.C. § 1151(b)(2)(A)(i). Meanwhile, children of lawful permanent residents may obtain lawful permanent residence themselves, but must wait for a country-specific visa to become available. 8 U.S.C. § 1153(a)(2). Notably, even if a K-visa holder's parent becomes a citizen (as has Petitioner's mother), a K-visa holder *must* adjust through the § 1255(a) process and cannot invoke a different basis for adjustment at

the ultimate decision as to whether that application is granted is left to the discretion of the Attorney General, who also has authority to promulgate regulations governing the adjustment of status process. *Id.* The IMFA also created 8 U.S.C. § 1255(d), which, in its first iteration, barred the Attorney General from adjusting a nonimmigrant's status solely on the basis of the K-visa. IMFA §§ 2(e), 3(b). That had the effect of forcing K-1 and K-2 aliens to satisfy § 1255(a)(2)'s eligibility requirement through the traditional means available under the INA to alien family members—by proving a legally cognizable familial relationship with the U.S. citizen petitioner under 8 U.S.C. § 1151(b)(2)(A)(i), such as a marital or a parent-child relationship. *See, e.g.*, *Kondrachuk v. U.S. Citizenship & Immigr. Servs.*, No. C 08–5476 CW, 2009 WL 1883720, at \*1-2 (N.D. Cal. June 30, 2009) (describing the adjustment process for K-visa holders under § 1255(a)). Procedurally, this meant that once the marriage took place, not only the K-1 alien parent but also each K-2 stepchild would need to prove eligibility through the submission of an I-130 petition—a petition filed by the U.S. citizen attesting that the K-2 alien was the "child" of the U.S. citizen. *See id.*; Dep't of Homeland Sec., Instructions for Form I-130, Petition for Alien Relative (Mar. 23, 2015), *available at* https://www.uscis.gov/sites/default/files/files/form/i-130instr.pdf (last visited Mar. 22, 2016) (hereinafter "Instructions for Form I-130").

This new requirement, however, produced an unintended consequence for some K-2 children because, under the INA, a stepchild only qualifies as a "child" of a

---

a later date, *e.g.*, adjustment based on her parent's naturalization. *See* 8 C.F.R. § 245.1(c)(6)(ii).

U.S. citizen if "the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred."  8 U.S.C. § 1101(b)(1)(B).  Thus, an alien child up to age twenty-one could obtain a K-2 visa and accompany her alien parent and any younger siblings to the United States, but, if she was eighteen to twenty-one years old when the marriage took place, the U.S. stepparent could not file an I-130 petition on her behalf.  The stepchild, in other words, had no mechanism to satisfy the requirements of § 1255(a)(2) and no other means to adjust status from within the United States.  *See, e.g.*, *Kondrachuk*, 2009 WL 1883720, at *1-2 (recounting the effect of the IMFA on K-2 visa holders); *see also* Memorandum from Michael L. Aytes, Assoc. Dir., U.S. Citizenship & Immigr. Servs. Domestic Ops., Regarding Adjustment of Status for K-2 Aliens (Mar. 15, 2007), *available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/k2adjuststatus031507.pdf (last visited Mar. 22, 2016) ("Aytes Memorandum") (confirming the unintentional IMFA-created gap).  The upshot was that, upon expiration of her K-2 visa, the stepchild was required to separate from her parents and siblings and to return to her home country to apply for admission to the United States from abroad based on her alien parent's newfound status as a lawful permanent resident.  *See* 8 U.S.C. § 1153(a)(2); *Kondrachuk*, 2009 WL 1883720, at *2 & n.3 (explaining that because an immigrant visa is not "immediately available" to a K-2 child based on the lawful permanent resident status of her alien parent, such child may not adjust status within the United States via § 1255(a)).

This unintentional gap for older K-2 children[3] prompted the then-existing Immigration and Naturalization Service (INS)[4] to take corrective action only two years after the IMFA passed, which led—in conjunction with statutory amendments passed by Congress in the same year—to the regime that governs the status adjustment process for K-2 children today. The INS promulgated 8 C.F.R. § 214.2(k)(6)(ii) (the "gap-filler"), under which a K-2 visa holder is deemed eligible to apply for status adjustment based solely on her K-1 parent "contracting a valid marriage to" the U.S. citizen who originally petitioned for the K-1 visa (so long as the marriage occurs within ninety days of the K-1 parent's "admission as a nonimmigrant pursuant to a valid K-1 visa"). *See also* Marriage Fraud Amendments Regulations, 53 Fed. Reg. 30,011, 30,017-18 (Aug. 10, 1988) (Supplementary Information). This gap-filling regulation

---

[3] Throughout this opinion, we use the descriptors "older K-2" and "older K-4" to refer to a child who is under twenty-one and thus young enough to obtain a K-2 or K-4 visa, but who was also over eighteen at the time of her parent's marriage and thus too old to qualify under 8 U.S.C. § 1101(b)(1)(B) as the "child" of her new stepparent.

[4] On March 1, 2003, the INS was disbanded as an independent agency within the United States Department of Justice, and its functions were reassigned to the United States Department of Homeland Security. Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451 & 471, 116 Stat. 2135, 2177-2212, codified at 6 U.S.C. §§ 251, 271 & 291. The INS was the agency responsible for promulgating all the regulations at issue in this case.

eliminated the need for a K-2 child to prove eligibility through her stepparent's I-130 petition by hinging the child's eligibility instead on her parent's marriage and not on her relationship with the U.S. stepparent. *See In re Akram*, 25 I. & N. Dec. 874, 878 & n.6 (BIA 2012) (citing *In re Le*, 25 I. & N. Dec. 541, 546 (BIA 2011) and *In re Sesay*, 25 I. & N. Dec. at 438-40); *In re Le*, 25 I & N. Dec. at 550; Aytes Memorandum.

While the rulemaking process for the gap-filler was underway, Congress also was legislating to the same effect, and only a few months after the gap-filler was finalized, President Reagan signed into law the Immigration Technical Corrections Act of 1988 (ITCA), Pub. L. No. 100-525, 102 Stat. 2609, which added language to § 1255(d) that serves virtually the same function as the gap-filler for K-1 and K-2 visas—the only K-visas then in existence. The ITCA amended § 1255(d) to allow the Attorney General to adjust the status of a K-visa holder "as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent) to the citizen who filed the petition to accord that alien's [K-1 or K-2] nonimmigrant status," thus making explicit that eligibility for even an older K-2 child's status adjustment turned on the marriage and not whether the alien qualified as her stepparent's "child" under 8 U.S.C. § 1101(b)(1)(B). *See* ITCA § 7(b).

More than a decade later, in recognition of the fact that K-visas benefited only alien fiancé(e)s and their children while alien spouses and their children (who were already stepchildren of U.S. citizens) still had to wait out approval of their lawful permanent residence from abroad, Congress expanded the K-visa program to create K-3 visas for foreign spouses and K-4 visas for their minor children. *See* The

10

Legal Immigration Family Equity (LIFE) Act, Pub. L. No. 106-553, § 1103(a), 114 Stat. 2762, 2762A-142 (2000) (as amended 2000); H.R. Rep. No. 106-1048, at 229-30 (2001). Because the marriage has already taken place, the process for obtaining these visas and adjusting status under the LIFE Act varies slightly from that governing K-1 and K-2 visa holders. To obtain a K-3 visa, the U.S. spouse must file two forms: an I-129F petition, which lists the alien spouse's children, requires submission of a valid marriage certificate, and serves as the petition for the K-visa itself, and an I-130 petition, which identifies the marital relationship between the spouses and begins the process for conferral of permanent residence. *See In re Akram*, 25 I. & N. Dec. at 877; 8 C.F.R. § 214.2(k)(7); Dep't of Homeland Sec., Instructions for Petition for Alien Fiancé(e)[5] (June 13, 2013), *available at* https://www.uscis.gov/sites/default/files/files/form/i-129finstr.pdf (last visited Mar. 22, 2016); Instructions for Form I-130. Upon approval of the I-129F petition and a subsequent interview at a United States embassy or consulate in the aliens' home country,[6] a K-3 visa is issued to the alien

---

[5] While the I-129F petition is still called the "Petition for Alien Fiancé(e)," its instructions expressly indicate that it is also the proper form to file on behalf of a K-3 spouse. 66 Fed. Reg. 42,587, 42,589 (Aug. 14, 2001) (explaining that, upon passage of the LIFE Act, the INS would "use the Form 1-129F [to consider petitions for K-3 and K-4 visas] until further notice").

[6] At this interview, each alien seeking a K-3 or K-4 visa must provide the following: (1) an individual Form DS-160 application for each individual (including one for each child, though each child's eligibility is ultimately tied to the

spouse and K-4 visas are issued to the unmarried children of the alien spouse under the age of twenty-one. *In re Akram*, 25 I. & N. Dec. at 877; 8 C.F.R. § 214.2(k)(3). A K-4 visa then lasts for two years or until a child's twenty-first birthday, whichever comes first. 8 C.F.R. § 214.2(k)(8).

Consistent with the goal of reunifying families stateside pending approval of their permanent residence, the LIFE Act also amended certain portions of the INA, reflecting an intention that K-2 and K-4 children would be accorded the same treatment. The LIFE Act reorganized the subsection that creates all K-visas by authorizing K-1 visas for fiancé(e)s in 8 U.S.C. § 1101(a)(15)(K)(i), K-3 visas for spouses in § 1101(a)(15)(K)(ii), and K-2 and K-4 visas for both categories of children (the children of K-1s and K-3s, respectively) in § 1101(a)(15)(K)(iii). LIFE Act § 1103(a). Thus, Congress provided for the issuance of both K-2 and K-4 visas in the same statutory section, defined their intended

---

single I-129F form filed by the American citizen); (2) a valid passport; (3) original or certified copies of birth certificates, the marriage certificate for the marriage to the U.S. citizen spouse, divorce or death certificates for any previous marriages, and police certificates identifying past and present countries of residence; (4) proof of a medical examination; (5) evidence of financial support; (6) passport-style photographs; (7) additional evidence of the spouse's relationship with the U.S. citizen; and (8) application fees for each visa recipient. U.S. Dep't of State: Bureau of Consular Affairs, *Nonimmigrant Visa for a Spouse (K-3)*, https://travel.state.gov/content/visas/en/immigrate/family/spouse-citizen.html (last visited Mar. 22, 2016).

recipients in the same terms as "the minor child[ren] of [K-1 or K-3 visa holders] [who are] accompanying, or following to join [their alien parents]," 8 U.S.C. § 1101(a)(15)(K)(iii), and extended § 1255(d)—the section that tied K-2 children's eligibility for adjustment of status under § 1255(a)(2) to "the marriage of the [child's parent] . . . to the citizen"—to K-4 children as well, *see* LIFE Act § 1103(c)(3).

Notwithstanding Congress's clear articulation of its intent to accord the same reunification benefits to K-4 children as enjoyed by their K-2 counterparts, the INS took the opposite tack. It not only failed to amend the 8 C.F.R. § 214.2(k)(6)(ii) gap-filler to reach older K-4 children or to promulgate a new regulation to plug any perceived gap for such individuals, it also promulgated 8 C.F.R. § 245.1(i) ("the Regulation"), which recreated for older K-4 children the very gap that § 1255(d) and 8 C.F.R. § 214.2(k)(6)(ii) had filled for older K-2 children. *See* "K" Nonimmigrant Classification for Spouses of U.S. Citizens and Their Children Under the Legal Immigration Family Equity Act of 2000, 66 Fed. Reg. 42,587, 42,594 (Aug. 14, 2001) (Supplementary Information). That is, instead of signaling that a K-4 child may adjust status without being the beneficiary of a separate I-130 petition (an impossibility for an alien child who does not qualify as the "child" of her U.S. stepparent by virtue of having been over eighteen at the time of the marriage), the Regulation provides:

> An alien admitted to the United States as a K-4 under [8 U.S.C. § 1101(a)(15)(K)(iii)] may apply for adjustment of status to that of permanent residence pursuant to [8 U.S.C. § 1255] at any time following *the approval of the Form I-130 petition filed on the alien's*

13

*behalf, by the same citizen who petitioned for the alien's parent's K-3 status.*

8 C.F.R. § 245.1(i) (emphasis added).

The Regulation thus ensnares a K-4 child who was over the age of eighteen at the time of her parent's marriage in a legal quandary. Having qualified for the K-4 visa to accompany her parent and younger siblings to the United States to reunite with her U.S. stepparent, a K-4 child between ages eighteen and twenty-one is limited by the Regulation to obtaining lawful permanent residence only by way of an I-130 petition filed by her stepparent—a petition which § 1101(b)(1)(B) precludes that stepparent from filing for a stepchild in this age group. Such a child, in other words, has no recourse but to leave her family behind in the United States and return to her home country to apply for a permanent visa from abroad.[7]

It may seem strange to impose this plight on the children of alien spouses given that the children of alien fiancé(e)s may adjust status as a direct consequence of the marriage and without having to independently demonstrate a parent-child relationship with their U.S. stepparents under § 1101(b)(1)(B); that both K-2 and K-4 children obtain their

---

[7] A K-4 child who was under eighteen at the time of her parent's marriage is still able to apply for adjustment of status under the Regulation because, due to her age at the time of the marriage, she would still qualify as her stepparent's "child" under § 1101(b)(1)(B). Her I-130 petition thus could be approved and would render her eligible to apply for permanent residence under § 1255(a).

14

nonimmigrant visas under § 1101(a)(15)(K)(iii); and that both K-2 and K-4 children derive their eligibility to adjust status from the same source: § 1255(d). The Regulation, however, does just that. *In re Akram*, 25 I. & N. Dec. at 879-81, 883 (confirming that the Regulation establishes this catch-22 for older K-4 children and expressly acknowledging that the 8 C.F.R. § 214.2(k)(6)(ii) gap-filling regulation absolves K-2 children of the same fate). Although the Seventh Circuit, in *Akram v. Holder*, 721 F.3d 853, 864-65 (7th Cir. 2013), struck down the Regulation as ultra vires, the Government has continued to enforce it outside that Circuit—in this case visiting its consequences upon Petitioner Si Min Cen.

## B. Factual and Procedural Background

Cen is a Chinese national who was nineteen when her mother married a U.S. citizen in China. After properly obtaining her K-4 visa and moving to the United States with her mother, Cen filed an application to adjust her status. As required by the Regulation, Cen's U.S. stepfather filed an I-130 petition on her behalf, but that petition and hence Cen's application were denied because Cen was nineteen when her mother married and therefore could not be deemed her stepfather's "child" under § 1101(b)(1)(B) for purposes of her stepfather's I-130 petition.[8]

At the same time, however, the Regulation also precluded Cen from adjusting her status on the basis of her

---

[8] It is undisputed that, once Cen passed her twenty-first birthday, her K-4 visa expired, 8 C.F.R. § 214.2(k)(8), and if she remains in the United States today, she does so without authorization.

15

mother's immigration status. After becoming a lawful permanent resident, Cen's mother filed an I-130 petition on Cen's behalf, which, because Cen is the biological child of her mother, was approved by the Government. On the basis of this approved I-130 petition, Cen again applied for adjustment of status, but she was denied this time because even though her mother's I-130 petition on her behalf had been approved—and even though her mother by that point had become a naturalized U.S. citizen—the Regulation specifies that, in order to be eligible for status adjustment, a K-4 child's I-130 petition must be filed by "the same citizen who petitioned for the alien's parent's K-3 status," i.e., the U.S. stepparent. 8 C.F.R. § 245.1(i).

Thwarted at every turn, Cen turned to the courts, challenging the Regulation and the denial of her application in the U.S. District Court for the District of New Jersey. At least initially, Cen was again blocked when the Government opened removal proceedings against her for overstaying her original K-4 visa and served her with a Notice to Appear. Because that action created a new administrative remedy for Cen to pursue, the District Court lost subject matter jurisdiction and Cen's complaint was voluntarily dismissed.

Cen duly appeared before an immigration judge (IJ) in Newark, who determined that Cen was not entitled to relief due to the Regulation. Bound by the BIA's precedential opinion in *In re Akram*, 25 I. & N. Dec. 874 (BIA 2012), the IJ concluded that Cen could only seek to adjust through an I-130 petition filed by her U.S. stepfather, not her mother, and that her stepfather's petition could not be approved because Cen, who was nineteen at the time of the marriage, did not qualify as her stepfather's "child" under § 1101(b)(1)(B). Cen appealed this decision to the BIA, which affirmed the IJ

16

and rooted its decision in *In re Akram*. The BIA determined (1) that the legislative history and structure of the relevant immigration laws supported the Regulation's requirement that only the stepparent may file an I-130 petition for a K-4 visa holder, (2) that the BIA did not itself have authority to declare regulations invalid in any event, and (3) that despite the Seventh Circuit having previously rejected *In re Akram* and struck down the Regulation, *see Akram*, 721 F.3d at 864-65, the BIA was not bound by that decision outside the Seventh Circuit.

Cen now petitions this Court for review of the BIA's decision, arguing that the Regulation is ultra vires under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and that she therefore should be able to adjust her status either by way of an I-130 petition filed by her mother or, like her K-2 counterparts, automatically upon her mother's adjustment, i.e., on the basis of the marriage itself.[9]

---

[9] In the alternative, Cen argues that the Regulation irrationally distinguishes between K-2 and K-4 children in violation of her constitutional right to equal protection under the law. Because we resolve this case on *Chevron* grounds, we do not reach Cen's constitutional claim. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *accord Akram*, 721 F.3d at 858, 865.

17

## II.    Jurisdiction and Standards of Review

We have jurisdiction to review final decisions of the BIA under 8 U.S.C. § 1252.  In this case, we review the BIA's decision de novo, subject to the principles of *Chevron* deference because we are considering the propriety of a regulation that has gone through notice-and-comment rulemaking, *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), and because the BIA's decision rests on legal determinations made in its precedential opinion of *In re Akram*, *see INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *Orozco-Velasquez v. Att'y Gen.*, --- F.3d ---, No. 13-1685, 2016 WL 930241, at *2 (3d Cir. Mar. 11, 2016).[10]

## III.   Discussion

Under the familiar two-step *Chevron* analysis, we first determine under Step One if Congress has "directly addressed the precise question at issue," and if so, we strike down a regulation that is contrary to Congress's "unambiguously expressed intent." *Chevron*, 467 U.S. at 842-43.  At Step One, we consider the statutory text, as well as "traditional tools of statutory construction," including canons of construction and the broader statutory context.  *Shalom Pentecostal Church v.*

---

[10] In its brief, the Government references the deference courts afford to an agency's interpretation of its own regulations under *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  Here, the BIA interpreted the Regulation's effect in *In re Akram* in a manner that is indeed consistent with the language of the Regulation.  We address below the underlying question whether the Regulation itself is a permissible construction of the INA, and we therefore review it through the lens of *Chevron*.

18

*Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 164-65 (3d Cir. 2015); *United States v. Geiser*, 527 F.3d 288, 292-94 (3d Cir. 2008). If, however, "the statute is silent or ambiguous with respect to the specific issue," we move on to Step Two, where "the question for the court is whether the agency's [regulation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. At Step Two, we may consider "the plain language of the statute, its origin, and purpose" in reviewing the reasonableness of a regulation. *Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005) (quoting *Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 110 (3d Cir. 1996)). Step Two affords agencies considerable deference, and "where Congress has not merely failed to address a precise question, but has given an 'express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' then the agency's 'legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Zheng*, 422 F.3d at 112 (quoting *Chevron*, 467 U.S. at 843-44). But deference under Step Two is not absolute, and the regulation must still "harmonize[]" with the statute, *id.* at 119 (quoting *O'Leary*, 93 F.3d at 110), and be "reasonable in light of the legislature's revealed design," *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995). Here, both parties urge that we resolve the case at Step One, and there we begin.

## A. The Legitimacy of the Regulation Cannot be Resolved at Step One

The Government argues that § 1255(d)'s plain text unambiguously evinces Congress's intent to bar older K-4 children from eligibility to apply for adjustment of status under § 1255(a) because they cannot establish a

19

§ 1101(b)(1)(B)-compliant relationship with their U.S. stepparents. Cen urges the opposite reading: that because § 1255(d) authorizes status adjustment "as a result of the marriage of" the K-3 parent and U.S. stepparent, all K-4 children under twenty-one are unambiguously eligible to adjust status on the basis of the marriage alone rather than the parent-child relationship with their stepparents. Were the Government correct that the plain language of the INA categorically bars older K-4 children from eligibility, we would have no need to proceed beyond Step One because the Regulation would reflect Congress's clearly stated intent. As explained below, however, we can dispose of this contention in short order because the two arguments pressed by the Government at Step One are untethered from the text of the statute.

First, the Government cherry-picks language from § 1255(d) to urge that its authorization for the Attorney General to adjust status on account of ". . . the citizen who filed the petition to accord that alien's nonimmigrant status" expressly identifies the U.S. stepparent as the basis for any adjustment and amounts to an unambiguous, affirmative requirement that a K-4 child prove a legally cognizable parent-child relationship with that stepparent to be eligible to adjust status under § 1255(a). But, in full, the relevant portion of § 1255(d) reads that the Attorney General may adjust the status of an alien "*as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent)* to the citizen who filed the petition to accord that alien's nonimmigrant status under [8 U.S.C. § 1101(a)(15)(K)]." 8 U.S.C. § 1255(d) (emphasis added). The Government, in other words, would have us excise the "as a result of the marriage of . . . the parent" language that immediately

20

precedes the excerpt on which it relies and thereby accord the statute an entirely different meaning.  We do not pay such short shrift to Congress's words.  *See, e.g.*, *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute[.]").  Instead, the reference to the marriage between a K-4 child's parent and the U.S. stepparent precludes reading § 1255(d) to unambiguously require a K-4 child to prove a parent-child relationship with her stepparent.  Indeed, not only does the text of § 1255(d) nowhere indicate that a parent-child relationship must be proven, but by its terms, it expressly predicates a K-4 child's eligibility on the marital relationship between her K-3 parent and U.S. stepparent (a topic to which we will return in Part III.B.1 below).

The Government's second attempt to anchor the Regulation's requirement in the plain text of the statute fares no better.  The Government would have us string together a series of INA provisions that it insists, when read in tandem, plainly and unambiguously require a K-4 child to demonstrate a parent-child relationship with her U.S. stepparent to be eligible to adjust status under § 1255(a).  Specifically, the Government argues that § 1255(d) does not absolve K-4 children from satisfying the three adjustment of status requirements of § 1255(a); that a K-4 child therefore must demonstrate eligibility and availability of an immigrant visa like any other alien family member of a U.S. citizen by complying with 8 U.S.C. § 1154(a)(1)(A)(i), which provides that a U.S. citizen "claiming that an alien is entitled to . . . an immediate relative status . . . may file a petition with the Attorney General for such classification"; and that the Supreme Court's statement in *INS v. Miranda*, 459 U.S. 14,

21

15 & n.2 (1982) (per curiam), that a "visa petition" is sufficient to satisfy the § 1255(a)(3) visa availability requirement means that an I-130 petition (which, in the case of K-4 children, would require compliance with the § 1101(b)(1) definition of "child") is the proper method of satisfying § 1154(a)(1)(A)(i). Ergo, according to the Government, § 1255(d) clearly and unambiguously provides that the filing of an I-130 petition by the K-4 child's U.S. stepparent is the exclusive means by which a K-4 child may adjust status.

As a threshold matter, we would hesitate to conclude that Congress clearly intended to deprive older K-4 children of any opportunity to adjust status from within the United States when the several disparate sections of the INA that, together, supposedly erect this bar lack a single cross-reference. *See Restrepo v. Att'y Gen.*, 617 F.3d 787, 792-93 (3d Cir. 2010) (according significance to the absence of a cross-reference when interpreting a statute); *United States v. Alvarez*, 519 F.2d 1036, 1044 (3d Cir. 1975) (same). The Government's premises, in any event, suffer three fundamental flaws.

First, there is no question that, when Congress has not provided otherwise, the eligibility of an immediate relative to adjust status under § 1255(a) is typically satisfied by the filing of an I-130 petition in accordance with § 1154(a)(1)(A)(i). For K-visa holders, however, the language of § 1255(d) suggests Congress *did* provide otherwise, authorizing these aliens to apply instead on the basis of the qualifying marriage.

Second, the language in § 1154(a)(1)(A)(i) is neither mandatory nor exclusive; indeed, while one "may" file an I-

22

130 petition to prove eligibility, that is not the only method of adjustment, nor would that be a sensible reading given that the 8 C.F.R. § 214.2(k)(6)(ii) gap-filler already allows K-2 children to adjust under § 1255(a) *without* filing an I-130 petition at all. Likewise, *INS v. Miranda* merely recognized that a "visa petition" "would have satisfied" the § 1255(a)(3) requirement; it did not hold that a visa petition was the exclusive means to satisfy § 1255(a). 459 U.S. at 15 & n.2.

Third, even assuming *arguendo* that a separate I-130 petition may be required for a K-4 child to adjust status, nothing in § 1255(d) or § 1154(a)(1)(A)(i) supports the Regulation's requirement that such a petition be filed by the U.S. stepparent and not by the alien parent once he or she has obtained lawful permanent residence or, as in this case, citizenship status.

In view of these deficiencies in the Government's plain language argument, we cannot resolve this case at *Chevron* Step One. Nor need we linger at Step One on account of Cen's own plain language argument, for even assuming that the INA on its face permits older K-4 children to apply for adjustment of status under § 1255(d), Congress expressly delegated to the Attorney General in § 1255(a) the authority to regulate eligibility to apply for adjustment of status, and we held in *Zheng v. Gonzales* that "the text of INA section [1255(a)] leaves some ambiguity about whether the Attorney General may determine by regulation what classes of aliens are eligible to apply for adjustment of status, thus precluding reliance on the first prong of the *Chevron* test." 422 F.3d at 120. As in *Zheng*, the Regulation bars a category of aliens from adjusting their status under § 1255(a), and such regulations are "subject to review for reasonableness under the second prong of the *Chevron* test." *Id.* at 114. We

23

therefore proceed to Step Two to consider whether the Regulation falls within the scope of the Attorney General's delegated authority. [11]

---

[11] Of course, a determination that the language of § 1255(d) is itself ambiguous would be an independent reason to proceed to *Chevron* Step Two. On the one hand, for the reasons set forth below, there is a compelling argument that the statutory language and structure of the INA clearly and unambiguously authorize older K-4 children to apply for adjustment of status on the basis of their parent's marriage and without proving an independent parent-child relationship with their stepparent. *See infra* Part III.B.1. On the other hand, the Government argues that the interplay of §§ 1101(b)(1)(B), 1154(a)(1)(A)(i), 1255(a), and 1255(d) makes the statute at worst ambiguous, and, while no party here disputes that the term "minor child" in §§ 1101(a)(15)(K)(iii) and 1255(d) has the same meaning as "child" in § 1101(b)(1), the INA is not explicit on this point. We need not decide whether § 1255(d) is itself ambiguous, however, because *Zheng* mandates in any event that we review the Regulation at Step Two as an exercise of the Attorney General's delegated authority to regulate eligibility. 422 F.3d at 119-20. To the extent there is arguably ambiguity as to the meaning of "minor child" in § 1255(d), moreover, we note that the BIA's "long-standing interpretation . . . that the undefined term 'minor child' means a 'child,' as defined in section [1101](b)(1) of the [INA]," *In re Le*, 25 I. & N. Dec. at 550; *see also* 8 C.F.R. § 214.2(k)(3), is consistent with the language and purpose of the INA as described below and therefore is entitled to *Chevron* deference. *Cf. Akram*, 721 F.3d at 856 (implicitly recognizing the reasonableness of

24

## B. The Regulation Is Invalid Under Step Two

In *Zheng*, we held that where the INA appears by its plain terms to render a class of aliens eligible to apply for adjustment of status under § 1255(a) and the Attorney General by regulation has barred that class from eligibility, we review the regulation at *Chevron* Step Two to "determine 'whether the regulation harmonizes with the plain language of the statute, its origin, and purpose.  So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.'"  422 F.3d at 119 (quoting *O'Leary*, 93 F.3d at 110).  That deference, however, is not unconditional, for while the Attorney General's discretionary authority under § 1255(a) "may be ambiguous enough to allow for some regulatory eligibility standards, it does not so totally abdicate authority to the Attorney General as to allow a regulation . . . that essentially reverses the eligibility structure set out by Congress."  *Id.* at 120.

Here, as in *Zheng*, we conclude the Regulation does reverse Congress's eligibility structure and must be struck down as "manifestly contrary" to the INA.  *Id.* at 112 (quoting *Chevron*, 467 U.S. at 844).  As explained below, our conclusion rests on (1) the plain language of § 1255(d); (2) the broader structure of the INA, as informed by canons of statutory construction; (3) the regulatory and statutory context of the LIFE Act; (4) the congressional purpose behind the adjustment of status process; and (5) our own precedent

_____

the BIA's interpretation of "minor child" by citing to *In re Le* for the proposition of defining a "minor child" as a "child" under the INA).

circumscribing the scope of the Attorney General's regulatory authority under § 1255(a).  We address these grounds in turn.

### 1.  Plain Language

While the Government argues that the plain language of § 1255(d) imposes the Regulation's requirement that a child prove a parent-child relationship with her U.S. stepparent in order to adjust status under § 1255(a), we read the statutory text to strongly indicate that Congress intended the opposite: that the *marriage* of the child's parent to the child's stepparent would itself render her eligible to apply for adjustment of status and that the only parent-child relationship of relevance to a K-4 child is the one between the child and her K-3 alien parent—not her U.S. stepparent.

By its plain terms, § 1255(d) provides that the Attorney General may adjust a K-visa holder's status "as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent) to the citizen who filed the petition to accord that alien's nonimmigrant status."  8 U.S.C. § 1255(d).  A K-4 child's eligibility to adjust status thus accrues "as a result of the marriage of" her K-3 parent and U.S. stepparent, not as a result of the K-4 child's § 1101(b)(1)(B) relationship with her U.S. stepparent. Indeed, the *only* relationships referenced in the text of § 1255(d) are the marital relationship between the K-3 parent and the U.S. stepparent and the parent-child relationship between the K-3 parent and the K-4 child; nowhere in § 1255(d) can we identify the source of the Regulation's procedural requirement that a K-4 child be the beneficiary of an I-130 petition that proves she is the "child" of her new stepparent as defined in § 1101(b)(1)(B).  Thus, while the Government rests its statutory interpretation of § 1255(d) on

26

the language referring to "the citizen who filed the [I-129F] petition to accord [the K-4 child's] nonimmigrant status," *see supra* Part III.A, we read "as a result of the marriage" to be the operative words of the statute, making clear that it is the marriage between the K-3 parent and the U.S. stepparent that renders any K-4 child up to age twenty-one eligible to apply for adjustment of status.[12] As such, it would stretch the meaning of the text beyond its limits to read the mere mention of the U.S. citizen petitioner in § 1255(d) to require that a K-4 child separately prove she qualifies as the "child" of her stepparent under § 1101(b)(1)(B).[13]

---

[12] The language referencing "the citizen who filed the petition to accord that alien's nonimmigrant status" was added to § 1255(d) in 1988 during Congress's attempt to stem the tide of marriage fraud. Read in context, this language simply forecloses a K-visa holder from adjusting status based on a K-1 or K-3 alien's marriage to a *different* U.S. citizen than the one who filed the I-129F petition on that alien's behalf. In the case of an alien fiancé(e), the statute thus would prevent a K-2 child from adjusting status if her parent were to marry someone other than the original U.S. citizen petitioner, and in the case of an alien spouse, the statute would prevent a K-4 child from adjusting status if her K-3 parent were to divorce, once stateside, from the U.S. citizen spouse who initially filed the I-129F petition to accord the K-3 and K-4 aliens their nonimmigrant visas and, perhaps, remarry a different U.S. citizen.

[13] Nor is there a plausible argument that the "parent" referenced in the clause "or, in the case of a minor child, the parent," refers to the U.S. stepparent, as a K-4 child's

Moreover, the Government itself has already rejected the very argument it makes here in two different regulations. First, in the 8 C.F.R. § 214.2(k)(6)(ii) gap-filler, the Government read § 1255(d)—even before it was amended by the ITCA—to dispense with any need for the U.S. stepparent to file an I-130 petition in order for a K-2 child to be eligible to adjust status. And the Government's continued adherence to the gap-filler indicates that it has not departed from that reading of § 1255(d) in the years since the ITCA. *E.g.*, Aytes Memorandum; *see also In re Akram*, 25 I. & N. Dec. at 878 & n.6 (citing *In re Le*, 25 I. & N. Dec. at 546 and *In re Sesay*, 25 I. & N. Dec. at 438-40). Put another way, the Government's reading of § 1255(d) in this case would seem to render its own gap-filling regulation ultra vires because both K-2 and K-4 children derive their eligibility to seek status adjustment under § 1255(a)(2) from the same statutory language in

---

eligibility to adjust status would then accrue "as a result of the marriage of the [citizen] to the citizen." This clearly cannot be correct. In contrast, reading § 1255(d) as contemplating a parent-child relationship between the K-3 parent and the K-4 child, rather than between the U.S. stepparent and the K-4 child, accords with the plain language and regulatory interpretations of "minor child" as used in the provision that authorizes K-4 visas in the first instance. 8 U.S.C. § 1101(a)(15)(K)(iii) (defining K-2 and K-4 children as "the minor child *of an alien described in clause (i) or (ii)*," which are the definitional clauses for K-1 and K-3 alien parents, respectively (emphasis added)); *see also In re Le*, 25 I. & N. Dec. at 547-48 (noting "minor child" has been interpreted to mean "child" of the alien parent since 1973); 8 C.F.R. § 214.2(k)(3); 66 Fed. Reg., at 42,589.

§ 1255(d). We are hard-pressed to see how that plain language can be read to require an I-130 petition for a K-4 child, but not for a K-2 child. The Government cannot have it both ways.

Second, in defining how K-3 and K-4 aliens may adjust status under § 1255(a), 8 C.F.R. § 245.1(c)(6)(ii) provides that a K-4 child "appl[ies] for adjustment of status based upon the marriage of the K-3 spouse to the United States citizen who filed a petition on behalf of the K-3 spouse." With this language, which is materially identical to language in 8 C.F.R. § 245.1(c)(6)(i) (defining eligibility for K-1 and K-2 visa holders) and which tracks the statutory text of § 1255(d), the Government itself has read a K-4 child's eligibility to apply for adjustment of status to turn on the relationship between the K-3 spouse and U.S. citizen—not on whether the K-4 child meets § 1101(b)(1)(B)'s definition of "child" in relation to her new stepparent.

Indeed, tying adjustment to the "petition [filed] on behalf of the K-3 spouse," 8 C.F.R. § 245.1(c)(6)(ii), rather than to a second petition filed on behalf of the K-4 child, makes sense given that a child obtains her K-4 visa as a derivative of her K-3 parent, i.e., *no separate petition* is filed in order to afford a K-4 child her initial nonimmigrant visa. Obtaining a visa pursuant to § 1101(a)(15)(K) is obviously a separate process from adjusting status under § 1255(a). But because the K-4 visa—like the K-2 visa—is designed to reunify families and, ultimately, to serve as a stepping-stone toward permanent residence, the most logical reading of the statute as a whole is that, whatever paperwork is required once stateside, Congress meant to authorize an application for adjustment based on the *marriage*. In the case of a K-2 child, that is handled by the filing of an I-485 petition, which

29

identifies the basis of such child's eligibility to apply for status adjustment as the marriage of her K-1 parent to a U.S. citizen, requiring only that the child append a copy of the K-1 parent's "petition approval notice" and marriage certificate. Dep't of Homeland Sec., Form I-485, Application to Register Permanent Residence or Adjust Status (revised Oct. 5, 2015), *available at* https://www.uscis.gov/sites/default/files/files/form/i-485.pdf (last visited Mar. 22, 2016). The Regulation's requirement that a K-4 child, in contrast, have her U.S. stepparent file an I-130 on her behalf cannot be reconciled with the plain language of § 1255(d) itself nor with the Government's prior interpretations of the very same text as embodied in 8 C.F.R. § 214.2(k)(6)(ii) and 8 C.F.R. § 245.1(c)(6)(ii).

## 2. Canons of Construction

The irreconcilable conflict between the Regulation and the statute becomes even more apparent when we consider § 1255(d) within the broader framework of the INA. While the Government urges that we should interpret 8 U.S.C. § 1255 in isolation, we do not approach statutory construction as a myopic exercise, but rather as a holistic endeavor in which we "interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (first quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); then quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)); *Shalom Pentecostal*, 783 F.3d at 164-65 (considering the overall design of the INA when assessing the plain meaning of a statutory provision under a *Chevron* Step One analysis); *Alaka v. Att'y Gen.*, 456 F.3d 88, 104-05 (3d Cir. 2006) (considering the overall design of the INA when

30

interpreting a single provision). We therefore apply this "traditional tool[] of statutory construction" to interpret § 1255(d) in its statutory context, *see Chevron*, 467 U.S. at 843 n.9; *Bautista v. Att'y Gen.*, 744 F.3d 54, 58 (3d Cir. 2014), and, in doing so, identify no less than six relevant canons of statutory interpretation that support our conclusion.

First, where a statutory provision lists multiple categories of individuals without differentiating between them, Congress is presumed to have intended that all such categories be treated the same. *See Clark v. Martinez*, 543 U.S. 371, 377-78 (2005) (concluding that, when a section of the INA listed three categories of aliens without differentiating between them, the statute clearly expressed that all categories be treated the same because to treat each category differently would "give the[] same words a different meaning for each category [and] would be to invent a statute rather than interpret one"). Here, Congress authorized both K-2 and K-4 visas in a single subsection, 8 U.S.C. § 1101(a)(15)(K)(iii), reflecting congressional intent to accord the same treatment to the two categories of visa holders. The Government urges that § 1101(a)(15)(K) is irrelevant to the propriety of the Regulation because it defines only the mechanism by which one obtains a K-visa and has nothing to do with adjustment of status under § 1255(a) and (d). We agree that § 1101(a)(15)(K) on its face does not speak to adjustment of status, but Congress's decision to address K-2 and K-4 visas together and without differentiation in both § 1101(a)(15)(K)(iii) and § 1255(d) provides textual and structural support for according them the same treatment for adjustment purposes. *See Clark*, 543 U.S. at 377-78.

31

Second, we "normally" give "identical words and phrases within the same statute . . . the same meaning," *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007), and, here, Congress used the term "minor child" in both of the subsections dealing with K-visa holders: § 1101(a)(15)(K)(iii) and § 1255(d). The Government nonetheless would have us read "minor child" in § 1101(a)(15)(K)(iii) to mean the child of the K-3 alien parent (for purposes of a K-4 child obtaining a K-visa), but then read "minor child" in § 1255(d) to mean the child of the U.S. stepparent (for purposes of a K-4 child adjusting status—thus triggering § 1101(b)(1)(B)'s definition of stepchild for adjustment purposes only and justifying the Regulation's bar to status adjustment for children whose parents wed after the child turns eighteen). Even putting aside that the Government eschews the latter interpretation of this very term in § 1255(d) as it relates to K-2 children, there is no textual basis for its reading of the statute, *see supra* note 13, nor any indication Congress intended to alter *whose* child a K-4 "minor child" must be for purposes of the K-visa versus adjustment of status. Rather, the text and this interpretive canon lead us to conclude the term should be interpreted the same way in both places, covering the § 1101(b)(1) children of the K-3 alien parent up to age twenty-one, *see supra* note 13, both for purposes of obtaining a K-4 visa and for adjusting status once stateside.

Third, "our duty to construe statutes, not isolated provisions," *Gustafson*, 513 U.S. at 568, means that definitions in other parts of the INA may also shed light on what Congress envisioned would be necessary for a K-4 child to apply to adjust her status. In this case, 8 U.S.C. § 1186a— the provision explicitly cross-referenced in § 1255(d) that

describes the conditional lawful permanent residence status for which K-visa holders apply under § 1255(a) and (d)—provides further evidence that Congress did not intend to require a K-4 child to prove she is the "child" of her U.S. stepparent to apply for adjustment of status. Section 1186a(h)(2) defines the "alien son or daughter" who is subject to the strictures of § 1186a as "an alien who obtains the status of an alien lawfully admitted for permanent residence . . . by virtue of being the son or daughter of an *individual* through a qualifying marriage." 8 U.S.C. § 1186a(h)(2) (emphasis added). The Government's reading of § 1255(d) would require us to interpret the word "individual" in § 1186a(h)(2) to refer only to the petitioning U.S. stepparent. But where Congress intended to distinguish between the terms "alien spouse" and "petitioning spouse," it did so, as reflected elsewhere in § 1186a. *See, e.g.*, *id.* § 1186a(c)(3)(A)(ii) ("If . . . the alien spouse and petitioning spouse appear at the interview [to remove the conditional nature of the alien spouse's lawful permanent residence] . . ."); *id.* § 1186a(h)(1), (4) (separately defining "alien spouse" and "petitioning spouse," respectively). Congress opted not to do so in defining "alien son or daughter" in § 1186a(h)(2), and, as the Supreme Court has said, "[w]here Congress includes particular language in one section of a statute but omits it from another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)); *see also Shalom Pentecostal*, 783 F.3d at 165. We thus accord significance to Congress's decision to describe an alien son or daughter's basis for admission to legal permanent residence under § 1186a—and, by extension, under § 1255(d)—not as her status as the child

33

of the "petitioning spouse," but as her status as the son or daughter of either parent, so long as it is "through a qualifying marriage."  8 U.S.C. § 1186a(h)(2).

Fourth, we find confirmation of Congress's intent in "the title of a statute and the heading of a section," both of which are "'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528-59 (1947)).  The part of the LIFE Act that created K-4 visas and extended § 1255(d) to cover them is entitled "Encouraging Immigrant Family Reunification," Pub. L. No. 106-553, tit. XI, 114 Stat. 2762, 2762A-142 (2000) (as amended 2000), making apparent that Congress intended K-4 visas to enable family reunification for parents and children up to age twenty-one who were seeking lawful permanent residence— not to authorize a temporary visit and concomitant statutory bar on the eighteen to twenty-one year olds in that group from ever adjusting status from within the United States.  To interpret the LIFE Act to require these children to separate from their parents and younger siblings in the United States and return to their home countries to apply for lawful permanent residence would hardly "Encourag[e] Immigrant Family Reunification"; it would statutorily impede it.

Fifth, we interpret statutes consistent with the canon that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Yet the Government would take us on a circuitous route through the INA to explain how § 1255(d) should be read to impose—by virtue of stringing together §§ 1255(a),

34

1154(a)(1)(A)(i), and 1101(b)(1)(B), *see supra* Part III.A—a devastating burden on K-4 children that is inconsistent with the statutory treatment of, and the agency's own preexisting regulatory framework for, K-2 children. The strictures of statutory construction compel us instead to stay on the clear path paved by the language of § 1255(d).

Finally, we avoid interpreting statutes in a way that would render them absurd. *See, e.g.*, *Republic of Iraq v. Beaty*, 556 U.S. 848, 861 (2009) (discounting a proffered statutory interpretation in part because it would have been "an absurd reading, not only textually but in the result it produces"); *Holy Trinity Church v. United States*, 143 U.S. 457, 459-60 (1892) (construing a law "to avoid [] absurdity"). Under the current regime, if a nineteen-year-old child of an alien spouse stays behind in her home country while her alien parent moves to the United States and adjusts status, that child would be eligible to apply for lawful permanent residence from abroad, albeit through a long and arduous process. The very purpose of K-visas, however, is to allow for family reunification stateside pending adjustment of status for the alien parent and minor children of the new family. It is therefore surely "unreasonable to believe that the legislat[ure] intended," *Holy Trinity Church*, 143 U.S. at 459, that, in granting K-4 visas to older alien children, it was, in effect, disqualifying any such child who chose to exercise that visa from seeking lawful permanent residence from within the United States. Indeed, the Government's reading of § 1255(d) would transform K-4 visas for older K-4 children into nothing more than tourist visas, giving their holders only a glimpse of what life with their families might have been like in America before being sent home because they are legally

35

incapable of fulfilling § 1255(a)(2)'s eligibility requirement. Such a reading defies common sense.

### 3. Statutory and Regulatory Context

The regulatory and statutory backdrop to the LIFE Act further demonstrates that the Regulation is incompatible with Congress's eligibility scheme, for "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . [or] adopts a new law incorporating sections of a prior law, . . . at least insofar as [the prior interpretation] affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (citations omitted). Here, before passing the LIFE Act in 2000, Congress was aware that the INS had promulgated 8 C.F.R. § 214.2(k)(6)(ii) to fill the gap for older K-2 children and to ensure they would be eligible to apply for adjustment of status on the basis of the qualifying marriage, without having to demonstrate a parent-child relationship with their new stepparent. And, of course, Congress itself had amended § 1255(d) in 1988 to specify that K-2 children could apply for status adjustment "as a result of the marriage."[14] ITCA § 7(b). Against this backdrop,

---

[14] Indeed, there can be no question as to Congress's awareness of the prior existence of 8 C.F.R. § 214.2(k)(6)(ii) because the gap-filler not only was on the books for twelve years before the LIFE Act, but also was promulgated at the same time as the ITCA, which added the "as a result of the marriage" language to § 1255(d). The fact that the ITCA was moving its way through Congress at the same time the gap-filler was working its way through administrative rulemaking indicates that both Congress and the Attorney General were—even at the time of the gap-filler's initial promulgation—on

Congress's re-enactment of this language without alteration when it extended § 1255(d) to the newly-created K-3 and K-4 visa holders indicates it expected K-4 children to likewise benefit from the gap-filler.

The Government counters that Congress also was aware of the age restriction for a stepchild to qualify as a "child" under § 1101(b)(1) and thus intended the LIFE Act to create a gap for older K-4 children. We reject this argument for three reasons. First, by adding the "as a result of the marriage" language to § 1255(d) in 1988, Congress created an alternative basis for eligibility to apply for status adjustment, eliminating the need for K-2 and K-4 children to qualify as the "child[ren]" of their U.S. stepparents under § 1101(b)(1). *See supra* Part III.B.1. Second, the statutory text makes plain that the only adult with whom a K-4 child must have a § 1101(b)(1) parent-child relationship is the K-3 alien parent. *See id.* Third, *Lorillard* counsels that, while Congress was presumptively aware of § 1101(b)(1)'s definition of "child" when it passed the LIFE Act, it was also presumptively aware that the INS had long interpreted "minor child" to mean an individual under age twenty-one and already interpreted § 1255(d), through the gap-filler regulation, to relieve K-2 children of the strictures of § 1101(b)(1) for purposes of adjusting status.[15] *See* 434 U.S. at 580-81. Thus, had

---

notice of each other's interpretations. *See, e.g.*, *Williamson Shaft Contracting Co. v. Phillips*, 794 F.2d 865, 870 (3d Cir. 1986) (presuming that Congress was aware of a regulation that had been promulgated eight years earlier).

[15] *Lorillard* also further confirms that the term "minor child" in § 1255(d) should be understood to mean "child" as

Congress intended to deviate from the gap-filler's existing interpretation, we would expect such deviation to have been explicit. *See id.*

---

defined in § 1101(b)(1). The INS's 1973 implementing regulation for K-visas, 8 C.F.R. § 214.2(k)(3), "incorporated the definition of a 'child' in [§ 1101(b)(1)]," which defines a child as an unmarried person under twenty-one for purposes of defining eligibility for a K-2 visa. *In re Le*, 25 I. & N. Dec. at 548 (noting the agency has never defined "minor child" but has instead used the statutory definition of "child"); *see also* 66 Fed. Reg. 42,589 (Aug. 14, 2001) ("K-4 aliens must be under 21 years of age and unmarried, in order to continue to meet the definition of 'child' under section [1101(b)(1)]."); Aytes Memorandum ("Officers should <u>NOT</u> limit the adjustment of status of K-2 aliens to persons under the age of 18 based on the term 'minor child' as it appears in [1255(d)]. The INA does not define the term 'minor child.' Section [1101](b)(1) defines the term 'child' as 'an unmarried person under twenty-one years of age.'"). Against the backdrop of the Government's consistent "treat[ment] [of] the term 'minor child' as synonymous with the term 'child,'" Congress re-enacted 8 U.S.C. § 1101(a)(15)(K) and "carried the term 'minor child' over into [§ 1255(d)]" in 1986. *In re Le*, 25 I. & N. Dec. at 548. Under *Lorillard*, we presume that, in including the same term in § 1255(d) in both the ITCA and, twelve years later, the LIFE Act, Congress was aware of and acquiesced to this definition. 434 U.S. at 580-81.

### 4. Congressional Purpose

Setting aside the text, structure, and history of the INA, the Government contends the Regulation is a reasonable exercise of the Attorney General's regulatory authority because it furthers Congress's intent to combat marriage fraud. According to the Government, there is a greater risk that K-3 and K-4 aliens will fraudulently obtain lawful permanent residence than their K-1 and K-2 counterparts because the marriages take place on foreign soil and because alien spouses are subject to fewer prophylactic fraud prevention measures than alien fiancé(e)s.[16] While the Government's interest in combatting marriage fraud is indisputably a valid one, the Government fails to explain how the Regulation furthers this goal and thus cannot justify the Regulation on this basis.

---

[16] Specifically, the Government places significance on the fact that fiancé(e)s undergo scrutiny of their intent to marry before being admitted to the United States (i.e., in the I-129F petition, upon applying for a K-1 visa, and before entry to the United States) and that they must establish their marriage is legitimate at the time of adjustment under § 1255, and again later when seeking to lift the conditional status conferred under § 1186a. *See, e.g.*, *In re Sesay*, 25 I. & N. Dec. at 442. It is unclear to us how these examples show any marked difference with alien spouses, who also must aver to their marriage on the I-129F petition and again during the interview that accompanies their application and must demonstrate a valid marriage both upon initial adjustment of status (via an I-130 petition) and when being interviewed to lift the § 1186a conditions on such status.

First, the INA already provides the Government with several means of combatting marriage fraud. A K-3 parent must have her initial visa petition—which includes proof of a valid marriage—approved before she and her children may even enter the United States, and the lawful permanent resident status that K-3 and K-4 aliens obtain thereafter is *conditional* under § 1186a. *See supra* Part I.A. This conditional status remains in place until the married couple jointly files to lift this designation in the ninety-day window preceding the second anniversary of obtaining conditional legal status. *See* 8 U.S.C. § 1186a(c)(1)(A), (c)(3)(B), (d)(2)(A). Only if, after an interview with the couple, the Government concludes that the marriage is not fraudulent does the alien's status and that of her children become truly permanent. *See id.* § 1186a(c)(1)(B), (c)(3). On the other hand, if at any time during this two-year period the Government concludes the marriage was fraudulent or has been annulled or terminated, the alien's permanent resident status is rescinded and she and, by extension, her children are rendered removable. *See id.* §§ 1186a(b)(1), (c)(3)(C); 1227(a)(1)(D)(i). This temporary, conditional status thus provides the Government with a backstop to prevent fraudulent marriages from resulting in permanent legal status and an additional mechanism to catch fraud that may have slipped through an initial review. *Accord Gallimore v. Att'y Gen.*, 619 F.3d 216, 222 (3d Cir. 2010) ("The purpose of [the § 1186a] scheme is obvious: to ferret out sham marriages entered into for the purpose of obtaining entry into the United States.").

Second, and more fundamentally, the Government has failed to explain why a regulation that targets the children—and more precisely, the older children—of alien spouses in

40

any way advances the underlying effort to combat marriage fraud. That goal may be served by careful scrutiny of the K-3 parent's I-129F and I-130 petitions and the documentation required at the visa interview to prove both the K-3 parent's relationship with the U.S. citizen-spouse and the children's relationship with their K-3 parent, but the Government has not shown how it is served by requiring a second I-130 petition on behalf of a K-4 child. Indeed, the Government candidly conceded at oral argument that the Regulation's effect of forcing older K-4 children back overseas does not prevent marriage fraud. Oral Arg. at 31:40-32:10.[17]

The stated goal of combatting marriage fraud thus cannot explain the Regulation's differential treatment of K-2 and K-4 children or why the Government should, in effect, accord less value to the dignity and integrity of a family unit when a U.S. citizen is already married to an alien spouse than when an alien is entering the United States with the stated intention of marrying a U.S. citizen. In short, the Government has failed to show the Regulation is "based on a permissible construction of the statute," *Zheng*, 422 F.3d at 116 (quoting *Chevron*, 467 U.S. at 843), or "comport[s] with Congress's stated intent," *id.* at 119, to combat marriage fraud.

---

[17] An audio recording of the oral argument is available online, at http://www2.ca3.uscourts.gov/oralargument/audio/14-4831Cenv.AttyGenUSA.mp3.

### 5. Limits on the Attorney General's Regulatory Authority

Finally, the considerations that led us in *Zheng* to hold that the regulation in that case exceeded the permissible scope of the Attorney General's regulatory authority under § 1255(a) compel the same conclusion here. *Zheng* instructed that we pay heed to "our obligation to respect the decisions of the immigration agencies" but recognized our "even higher obligation to respect the clearly expressed will of Congress." 422 F.3d at 120. And while acknowledging the Attorney General's authority under § 1255(a) to regulate eligibility to apply for adjustment of status, *Zheng* demarcated the bounds of that authority: Where Congress has made clear through the statutory language, structure, history, and purpose its intent to authorize a certain class of aliens to apply for adjustment of status, a regulation that strips such aliens of eligibility altogether cannot be deemed "reasonable in light of the legislature's revealed design." *Id.* at 116 (quoting *NationsBank*, 513 U.S. at 257); *see id.* at 119-20.

Here, the Attorney General overstepped those bounds. Whereas Congress envisioned that an alien spouse and her K-4 children up to age twenty-one could enter the United States and live as a family with the U.S. spouse while applying for adjustment of status, the Regulation makes it legally impossible for an older K-4 child to apply at all, so long as she remains part of the family unit. And whereas, by enacting § 1255(d), Congress closed a gap that would have forced such children to return to their home countries if they had passed their eighteenth birthday by the date of their parent's marriage, the Regulation "essentially reverses the eligibility structure set out by Congress," *id.* at 120, by reopening that gap and thereby categorically barring the otherwise eligible

class of older K-4 children from applying for adjustment within the United States. Thus, as in *Zheng*, the Regulation cannot be "harmonize[d] with the plain language of the [INA], its origin, and purpose," *id.* at 119 (quoting *O'Leary*, 93 F.3d at 110), and cannot survive scrutiny under *Chevron* Step Two.[18]

## IV.  Conclusion

While the nation's immigration laws are at times labyrinthine, we decline to hold today that they offer older K-4 children nothing more than a legal dead end. For the aforementioned reasons, although we reach our decision at *Chevron* Step Two rather than Step One, we ultimately agree with the thoughtful decision of the Seventh Circuit in *Akram* and likewise hold that 8 C.F.R. § 245.1(i) is invalid. Accordingly, we will grant Cen's petition for review, reverse

[18] We leave to the Department of Homeland Security and the Attorney General, pursuant to her regulatory authority, the appropriate mechanism to resolve this problem, whether through providing a basis for eligibility analogous to what now exists for K-2 children under the 8 C.F.R. § 214.2(k)(6)(ii) gap-filler (as effectuated by the I-485 petition) or otherwise. We note, however, that should the Government decline to promulgate a regulation mirroring 8 C.F.R. § 214.2(k)(6)(ii) and instead simply allow a K-4 child to adjust on the basis of an I-130 petition filed by her K-3 parent once that parent obtains lawful permanent residence, the strictures of § 1255(a) would still require that K-4 child prove the immediate availability of a country-specific visa, *see* 8 U.S.C. § 1153(a)(2), thus denying her the same benefits enjoyed under the gap-filler by her K-2 counterparts.

the Board's decision, and remand Cen's case for proceedings consistent with this opinion.